801 A.2d 1158 (2002)
353 N.J. Super. 145
Ann BAKER and Barbara Hausleiter, Plaintiffs-Respondents/Cross-Appellants,
v.
The NATIONAL STATE BANK, (a/k/a CoreStates, its Successor-In-Interest), Defendant-Appellant/Cross-Respondent,
and
Leo Ahern, as Regional Manager and individually, and Arthur Campbell, as Executive Vice-President, and individually, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued June 5, 2002.
Decided June 21, 2002.
*1162 David H. Ganz, Somerset, argued the cause for appellant/cross-respondent (Collier, Jacob & Mills, attorneys; Cynthia M. Jacob and Mr. Ganz, of counsel; Mr. Ganz, Alan G. Lesnewich and Sandra N. Fears, on the brief).
Patricia Breuninger, argued the cause for respondent/cross-appellant (Breuninger & Fellman, attorneys, Fawnwood; Ms. Breuninger, of counsel, Frederic J. Gross and Susan E. Babb, Mount Ephraim, on the brief).
Before Judges NEWMAN, FALL and AXELRAD. *1159 *1160
*1161 The opinion of the court was delivered by NEWMAN, J.A.D.
In this employment discrimination action, on appeal for the second time before this court, defendant National State Bank (the Bank) (subsequently merged with CoreStates and then acquired by First Union National Bank) appeals from the trial court's remittitur of a punitive damages award. The trial court reduced the award of $4 million to $1.8 million. The Bank argues that the court erred in: (1) finding that the remitted award was not a violation of the Bank's constitutional, due process rights; (2) concluding that the unremitted award was not the result of passion, prejudice or mistake; and (3) awarding postjudgment interest on the punitive damages, accruing from the date of the jury verdict. Plaintiffs Ann Baker and Barbara Hausleiter cross-appeal the trial court's remittitur of the punitive damages award, contending that the $4 million award was not excessive. We now affirm both on the direct and cross-appeal.
We need not repeat the facts of this case which are set forth in our earlier opinion in Baker v. Nat'l State Bank, 312 N.J.Super. 268, 711 A.2d 917 (App.Div.1998). Our opinion was affirmed by the Supreme Court, except for a remand on the issue of punitive damages, remanding to the trial court to consider whether the punitive damages award violated due process, in light of the standards enumerated by the United States Supreme Court in BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). 161 N.J. 220, 231, 736 A.2d 462 (1999).

I.
We first address the standard of review to be applied by this court. In Cooper-Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), the Supreme Court addressed this very issue. The Court held that a trial court's consideration of the three criteria outlined in BMW would be subject to de novo review because an award of punitive damages was not really a "fact tried by the jury." 532 U.S. at 437, 121 S.Ct. at 1686, 149 L.Ed.2d at 687 (internal quotations omitted). In a footnote, the Court added that it "of course remains true that Court of Appeals should defer to the District Court's findings of fact unless they are clearly erroneous." 532 U.S. at 440 n. 14, 121 S.Ct. at 1688, 149 L.Ed.2d at 689-90. See also Lockley v. Turner, 344 N.J.Super. 1, 27, 779 A.2d 1092 (App.Div. 2001) (noting recent decision of Cooper and its holding that de novo standard of review *1163 applies), certif. granted, 172 N.J. 179, 796 A.2d 896 (2002).
In Cooper, the Supreme Court reasoned that independent review was required because punitive damages are designed to exact punishment and therefore should be subject to the same analysis as criminal penalties. 532 U.S. at 432, 121 S.Ct. at 1683, 149 L.Ed.2d at 684-86. The Court looked to a number of criminal cases involving whether the criminal sentence imposed (death penalty, life imprisonment, punitive forfeiture) was grossly disproportionate to the gravity of the offense, and noted that in each of those cases, the Court engaged in an "independent examination of the relevant criteria." Id. at 434, 121 S.Ct. at 1684, 149 L.Ed.2d at 686.
The Court also rejected the argument that a trial court possessed any advantage in reviewing a punitive damage award. Id. at 440, 121 S.Ct. at 1687-88, 149 L.Ed.2d at 689-90. Pointing to the three factors outlined in BMW, the Court maintained that a trial court only had a slight advantage over an appellate court in determining reprehensibility, that a trial and appellate court were equally capable of evaluating the ratio, and that an appellate court was more suited to analyzing the third factor, civil penalties imposed in comparable cases, because that "calls for broad legal comparison." Ibid.
Because de novo review means that no special deference will be accorded to a trial court's findings of fact and conclusions of law, the trial court's characterization of the evidence in support of the award of punitive damages is of little significance. See Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 81 (1st Cir. 2001) (holding that both extent of punitive damage award and sufficiency of evidence on which it was premised required de novo review).
De novo review means that a reviewing court may disagree with the lower court's findings and conclusions. See Goodman v. London Metals Exch., Inc., 86 N.J. 19, 28-29, 429 A.2d 341 (1981) (stating that with de novo review, reviewing court may disagree with lower court's findings and rulings). In sum, no deference need be paid to the trial court's application of the BMW test.
We next focus on the three BMW guideposts. In BMW, the Supreme Court held that a punitive damages award may be so excessive as to violate substantive due process. 517 U.S. at 585-86, 116 S.Ct. at 1604, 134 L.Ed.2d at 832-33. There, the Court considered a $2 million punitive damages award for misconduct causing $4000 in compensatory damages, a ratio of 500 to 1. Id. at 567, 116 S.Ct. at 1595, 134 L.Ed.2d at 820-21. The Court concluded that the punitive damages award transcended "the constitutional limit" and remanded for consideration of three "guideposts" to determine whether the award comported with principles of fairness. Id. at 585-86, 116 S.Ct. at 1604, 134 L.Ed.2d at 832-33. Those guideposts required a consideration of: (1) the degree of reprehensibility of the conduct that formed the basis of the civil suit; (2) the disparity between the harm or potential harm suffered by the plaintiff and the plaintiff's punitive damages award; and (3) the difference between this remedy and other penalties authorized or imposed in comparable cases of misconduct. Id. at 575, 116 S.Ct. at 1598-99, 134 L.Ed.2d at 826.

II.
The Bank contends that its conduct was not so reprehensible as to support even the remitted $1.8 million punitive damages award. Plaintiffs argue that the Bank's misconduct was extremely reprehensible, *1164 and the original jury award of $4 million was appropriate.
On remand in this case, in its analysis of the first prong of the BMW test, the trial court first quoted verbatim from this court's opinion discussing the Bank's egregious conduct:
"Indeed selecting plaintiffs for termination and subsequently searching for reasons to justify that selection is evil minded, intentional wrongdoing. The evidence supported a finding that this occurred. Ahern testified that Campbell told him `plaintiffs have to go.' When Ahern reported back to Campbell that Baker's file justified her selection but Hausleiter was questionable, Campbell and Ahern then obtained notes and placed them in Hausleiter's file."
....
"The evidence further supports the Judge's conclusion that defendant set about to trash the reputations of the plaintiffs. Defendants accused Baker of having bad loans and overdrafts, which was not true. Campbell said that Baker was chosen for termination because of the unsatisfactory performance of her branch, Perth Amboy, but admitted that she was assigned to manager [sic] that branch because of her ability and experience, and further admitted that the branch has [sic] improved in the time that she managed it."
Appellate Division went on to say the defendants also accused Hausleiter of problems with her loan portfolio was [sic] not true, which was not true. Ahern admitted that the notes did not criticize Hausleiter. The notes were not originally in Hausleiter's file, and there was no criticism in her performance appraisal. There was evidence that the other discharged employees were not replaced. Campbell was unable to identify any employees on the riff [sic] list besides the plaintiffs who were replaced.
The circumstances here are as egregious as those in RENDINE (phonetic) in which the Court approved punitive damages for two plaintiffs who were discharged from their employment when they sought to return after maternity leave despite defendant's promise that their positions would be available. Here, as in RENDINE, the defendant's conduct was devious and dishonest.
The trial court then discussed the evidence that it viewed to be indicative of the Bank's reprehensible conduct.
In addition to considering the Appellate decision in this regard, the Court finds evidence in support of a conclusion of reprehensibility supported by the fact that plaintiff Baker was blamed for poor conditions which she did not create, that she was terminated after 19 years of service for a younger male who survived only two months at that position. She was subjected to false and insulting allegations and her character and reputation impugned. That in part it was done after the fact in an effort to conceal the true reasons for her termination. That the defendants lied to the plaintiffs in that they were actually told their positions were eliminated, when unlike all the other terminations their positions were not.
When defendant Ahern asked defendant Campbell how to pick the 10 percent for the riff [sic], he was expressly told[,] Baker and Hausleiter have to go. No one else was singled out. The justifications by Campbell, Ahern and the corporate defendant was [sic] pretextual. Witness Gervasio was supportive of the plaintiffs but never contacted by Ahern, when he would obviously have been an appropriate person to have contacted.

*1165 Ahern and Campbell fabricated poor performance. That was rebutted by Gervasio [sic], Listach (phonetic), and Couch, as well as the plaintiffs and their personnel files. And not only were they false, the defendants knew them to be false.
In discussing reprehensibility in BMW, the Supreme Court noted that it was "[p]erhaps the most important indicium of the reasonableness of a punitive damages award," and identified three "aggravating factors" associated with particularly reprehensible conduct. 517 U.S. at 575-76, 116 S.Ct. at 1599, 134 L.Ed.2d at 826-27. First, nonviolent crimes were less serious than violent crimes; second, offenses involving "trickery and deceit" were more reprehensible; and third, evidence of repeated, prohibited conduct justified more severe punishment. Id. at 576-77, 116 S.Ct. at 1599, 134 L.Ed.2d at 826-27. The Court added that purely economic injury could warrant a substantial penalty when the injury was the result of intentional and affirmative misconduct, or when the target was financially vulnerable. Ibid. However, it cautioned that did not mean all acts that cause economic harm were "sufficiently reprehensible to justify a significant sanction in addition to compensatory damages." Ibid.
Thus, in the wake of BMW, one court has stated that the case outlined a "hierarchy of reprehensibility," with acts and threats of violence at the top, "followed by acts taken in reckless disregard for others' health or safety, affirmative acts of trickery and deceit, and finally, acts of omission and mere negligence." Florez v. Delbovo, 939 F.Supp. 1341, 1348-49 (N.D.Ill.1996).
In that context, it is plain that the Bank's actions do not reach the top of the reprehensibility scale. Its termination of plaintiffs, although discriminatory, was nonviolent and did not involve repeated, prohibited conduct. However, the Bank's actions did involve trickery and deceit. The Bank decided first to terminate plaintiffs and then provided reasons to justify its decision, including the placement of Gervasio's notes into Hausleiter's personnel file and the explanation which was successfully rebutted at trial, that both plaintiffs had poor loan portfolios. Plaintiffs were also initially told that their positions had been eliminated; that turned out to be false as two younger employees were transferred to their branch management positions.
Moreover, this case did not involve pure economic loss as plaintiffs were awarded damages for emotional pain and suffering, and thus sustained personal injuries. With respect to financial vulnerability, they struggled financially following their termination and had to reduce their standards of living considerably.
The second BMW factor requires an examination of the ratio between the harm, or the compensatory damages award and the punitive damages award in order to determine whether a "reasonable relationship" exists between the two. BMW, supra, 517 U.S. at 580, 116 S.Ct. at 1601, 134 L.Ed.2d at 829.
In BMW, the Court rejected "the notion" that an unconstitutional ratio could be determined by a "simple mathematical formula," stating that it could not "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." Id. at 583, 116 S.Ct. at 1602, 134 L.Ed.2d at 831. The Court emphasized that a "general concern of reasonableness" was most crucial. Ibid.
Here, the trial court briefly discussed the ratio, noting that while the Punitive Damages Act (PDA), N.J.S.A. 2A:15-5.9 to -5.17, excluded LAD cases from its *1166 limitation of punitive damages to a five to one ratio, that ratio should be considered a general guideline. In making that statement, the trial court followed our Supreme Court's ruling in this case. The Court specifically stated that on remand, the trial court "may consider but is not bound by, the Legislature's judgment of five times compensatory damages as a normative measure of the limits of proportion." Baker, supra, 161 N.J. at 231, 736 A.2d 462.
As an initial matter, both parties disagree as to the amount of the compensatory damages for purposes of determining the ratio. The jury awarded plaintiffs compensatory damages on the following basis:

 Baker
 Back Pay from 10/29/91-3/29/93 $ 35,824
 Front Pay from 3/29/93-7/1/96 $ 42,916
 Emotional pain and suffering $ 57,000
 ________
 $135,740
 Hausleiter
 Back Pay from 10/29/91-3/29/93 $ 19,967
 Front Pay from 3/29/93-7/1/96 $ 39,274
 Emotional pain and suffering $ 53,000
 ________
 $112,241

In the order incorporating the jury verdict, the trial court added prejudgment interest, running from December 30, 1992, the date the complaint was filed, to July 1, 1996. The court added $19,349 in interest to Baker's award, and $15,994 to Hausleiter's award, making Baker's total $155,089, and Hausleiter's $128,235.
The Bank contends that the relevant compensatory damages for purposes of the ratio are only the emotional pain and suffering awards. Plaintiffs argue that the total sum, comprised of back pay, front pay, emotional pain and suffering, interest, and attorney's fees must be considered. Plaintiffs further argue that the amount of compensatory damages is actually higher because they were never awarded any "true" front pay.
We reject the Bank's contention that compensatory damages means only pain and suffering. Compensatory damages include money damages awarded to a plaintiff "by way of compensation, to make up for some loss that was not, originally, a money loss but one that ordinarily may be measured in money." Dan B. Dobbs, Remedies, "Principle of Damages," § 3.1 at 135 (3d ed.1973). In an employment discrimination case, such damages include back pay, provided "to make the discriminatee whole by reimbursement of the economic loss suffered," and front pay, provided to compensate the employee for future lost wages attributable to the employer's misconduct. Goodman, supra, 86 N.J. at 34-35, 429 A.2d 341; Levinson v. Prentice-Hall, Inc., 868 F.2d 558, 563 (3d Cir.1989); Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 135, 735 A.2d 548 (1999). In discussing the amount of compensatory damages awarded in this case, the Supreme Court specifically included the back and front pay amounts; the Court noted that Baker was awarded "a total of $135,740 in compensatory damages" and "Hausleiter a total of $102,241 [sic] in compensatory damages." Baker, supra, 161 N.J. at 225, 736 A.2d 462; see also Cavuoti, supra, 161 N.J. at 115, 735 A.2d 548 (stating that jury awarded plaintiff $222,323 in compensatory damages, or $177,323 in lost wages and $45,000 for emotional distress).
Thus, there is no need to discuss in detail the cases cited by the Bank to support its argument that compensatory damages are limited to pain and suffering. Those cases do exclude back and front pay from the definition of compensatory damages, but are of little persuasive authority, given the clear position on compensatory damages in this State.
Addressing plaintiffs' arguments, they first argue that prejudgment *1167 interest must be included in the compensatory damages figure. We agree, because by court rule and case law, prejudgment interest in tort actions is required to fully compensate the plaintiff.
Rule 4:42-11(b) requires a court to award prejudgment interest in all tort actions. Prejudgment interest is mandated because its purpose "is compensatory, to indemnify the claimant for the loss of what the moneys due him would presumably have earned if payment had not been delayed." Busik v. Levine, 63 N.J. 351, 358, 307 A.2d 571, appeal dismissed, 414 U.S. 1106, 94 S.Ct. 831, 38 L. Ed.2d 733 (1973); see also Loeffler v. Frank, 486 U.S. 549, 558, 108 S.Ct. 1965, 1971, 100 L. Ed.2d 549, 559 (1988) (stating that prejudgment interest "of course, is an `element of complete compensation'"). It has also been held that R. 4:42-(11)(b) applies to damages awarded pursuant to LAD. Milazzo v. Exxon Corp., 243 N.J.Super. 573, 576, 580 A.2d 1107 (Law Div.1990). There, the court reasoned that since N.J.S.A. 10:5-13 specifically was amended to provide a LAD plaintiff with "[a]ll remedies available in common law tort actions," it was clear that the Legislature intended R. 4:42(11)(b) to apply to LAD. Ibid.; accord Gallo v. Salesian Soc'y Inc., 290 N.J.Super. 616, 661, 676 A.2d 580 (App.Div.1996).
Since the motivating purpose behind the ratio is to ensure that the relationship between the punitive damages awarded and the actual damages suffered is reasonable, it is appropriate for the actual or compensatory damages figure to include all monies awarded to fully compensate the plaintiff, including prejudgment interest.
Plaintiffs next argue that their actual damages were greater than the award indicates because the trial court erroneously accepted defendant's definition of front pay, which was really another back pay award. Plaintiffs assert that the trial court's definition of front pay was erroneous and point to this court's opinion in this case, which noted that the trial court "accepted defendants' erroneous definition of `front pay'." Baker v. Nat'l State Bank, No. A-488-96T5 at 39 (App.Div.1998) (Emphasis added). The trial court's formulation of front pay was incorrect; the court defined that period to run from each plaintiff's respective date of re-employment to the date of the verdict. Instead, front pay should begin from the date of the verdict to retirement. Blum v. Witco Chem. Corp., 829 F.2d 367, 374 (3d Cir.1987). Thus, plaintiffs maintain that they should have been awarded substantially more in front pay to compensate them for their decreased salaries following their terminations, approximately $67,8728 for Baker and approximately $96,384 for Hausleiter.
Even though the trial court erred in its formulation of front pay, plaintiffs are not entitled to consideration of a higher front pay figure, for purposes of the ratio. Plaintiffs did not raise that issue in the first appeal as this court's unabridged opinion, in its discussion of front pay, mentions only that defendants argued that the trial court had erred on that issue. Baker, supra, No. A-488-96T5 at 38 Therefore, plaintiffs have waived the right to raise the issue in this appeal. Liebling v. Garden State Indent., 337 N.J.Super. 447, 465-66, 767 A.2d 515 (App.Div.) (holding that an issue not briefed is deemed waived), certif. denied, 169 N.J. 606, 782 A.2d 424 (2001). Furthermore, it would be unfair to allow plaintiffs to raise the issue at this time simply because they find it expedient for purposes of this appeal but not the prior appeal, to argue the matter of front pay. Plaintiffs had the opportunity to raise this issue during the first appeal and chose not to do so.
*1168 Plaintiffs also argue that they could have suffered even greater compensatory damages but that they mitigated the effects of their terminations by persistently seeking re-employment. They point to the Supreme Court's statement that a reasonable relationship must exist between the punitive damages award and "the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." BMW, supra, 517 U.S. at 581, 116 S.Ct. at 1602, 134 L.Ed.2d at 830 (emphasis added).
Plaintiff's argument is unpersuasive for two reasons: (1) they had a legal duty to mitigate their damages; and (2) the Supreme Court's statement was made in contemplation of situations where the tortious plan was unsuccessful. See TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 460, 113 S.Ct. 2711, 2721, 125 L.Ed.2d 366, 381 (1993) (stating that it is "appropriate to consider the magnitude of the potential harm that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded"). Since the Bank was successful in its tortious conduct through its termination of plaintiffs, the magnitude of potential harm is moot.
As for the issue of attorney fees, there is no reason to consider attorney fees to be part of compensatory damages. LAD specifically includes attorney fees under a separate section, N.J.S.A. 10:5-27.1, indicating that it is an award in addition to compensatory damages. Traditionally, an award of attorney fees is not considered to be compensatory, but provided, as a policy matter in specific types of cases, to remedy the problem of unequal access to the courts. Rendine v. Pantzer, 141 N.J. 292, 322-23, 661 A.2d 1202 (1995).
In sum, the amount of compensatory damages consists of plaintiffs' awards for back pay, front pay (as awarded by the jury), pain and suffering, and prejudgment interest. That amount equals $283,324 ($155,089 for Baker and $128,235 for Hausleiter). The ratio of unremitted punitive damages ($4 million) to compensatory damages is roughly fourteen to one; the ratio of remitted punitive damages ($1.8 million) to compensatory damages is approximately six to one.
The Bank argues that other civil penalties did not give it fair notice of the remitted punitive damages award. Plaintiffs argue that the Bank had fair notice of the unremitted award through case law and federal and state statutes.
In BMW, the Supreme Court held that a comparison of the punitive damages award to civil or criminal penalties that could be imposed for comparable misconduct provided a "third indicium of excessiveness." BMW, supra, 517 U.S. at 583, 116 S.Ct. at 1603, 134 L.Ed.2d at 831. The Court looked to applicable statutes, reasoning that "substantial deference" should be given "to legislative judgments concerning appropriate sanctions for the conduct at issue." Ibid. In addition, other civil penalties were relevant because they indicated whether a defendant was given fair notice as to its potential liability for particular misconduct. Id. at 574, 116 S.Ct. at 1598, 134 L.Ed.2d at 825-26. In BMW, the Court restricted its examination of other penalties to statutory analysis, looking only to the applicable state statute. Id. at 584, 116 S.Ct. at 1603, 134 L.Ed.2d at 831-32.
Following BMW, some courts have looked not only to applicable statutes but also to case law, to determine whether the punitive damages award is comparable to those awarded in similar cases. See, e.g., Equal Employment Opportunity Comm'n v. Harbert-Yeargin, Inc., 266 F.3d 498, 516-17 (6th Cir.2001). However, at least one court has concluded that while decided *1169 cases are relevant, positive law, meaning statues and regulations "are even more critical." Zimmerman, supra, 262 F.3d at 83; see also In re Exxon Valdez, 270 F. 3d 1215, 1229-30 (9th Cir.2001) (looking only to state and federal legislative and executive penalties).
In this case, the trial court found that there were no relevant civil penalties. The court first noted that LAD, N.J.S.A. 10:5-14.1A[1], provides for a penalty of not more than $2000 for the first offense and not more than $5000 for the second and each subsequent offense. LAD's penalty, however, was not truly comparable because the statute merely imposed "nominal damages for technical violations."
The trial court also found Title VII's damages cap of $300,000 to be of little value because the Supreme Court had in "no way" suggested that statute to be a relevant factor. Besides, Title VII's damages cap bears little relevance because plaintiff's action was brought under LAD, which has no damages cap. Furthermore, LAD, specifically N.J.S.A. 10:5-14.1a, is of limited guidance because those fines are levied "in addition to any other relief or affirmative action provided by law...." Therefore, the fines are not intended to be the primary means of enforcement of LAD violations. In addition, that section must be read in conjunction with the PDA, which specifically exempts LAD from the punitive damages cap. N.J.S.A. 2A:15-5.14 limits punitive damages to five times the compensatory damages award or $350,000, whichever is greater. Since the Supreme Court concluded that an analysis of other penalties for comparable misconduct was helpful, in part, because courts should defer to legislative judgments, an analysis of other penalties is not particularly helpful in LAD cases where the legislature specifically declined to place a cap on punitive damages.
However, the second reason for considering other civil penalties is to determine whether defendant was given "fair notice" of the amount of the punitive damages. In determining fair notice, it is appropriate only to consider those statutes and cases in effect at the time of the Bank's decision to terminate plaintiffs in 1991.
Consequently, as a matter of notice, the PDA's exemption of LAD is of little relevance because that statute was not in effect in 1991; it was enacted in 1995. LAD was amended in 1990 (N.J.S.A. 10:5-13) to provide that a LAD plaintiff was entitled to all "remedies available in common law tort actions," which would include punitive damages. Thus, the Bank was definitely on notice that it could be liable for punitive damages. Whether the Bank was on notice that it could be liable for either $4 million or $1.8 million in punitive damages requires an examination of decided cases.
The Bank cites to three cases decided prior to 1991, arguing that none of those cases gave it fair notice of a $1.8 million punitive award. In Erickson v. Marsh & McLennan Co., 117 N.J. 539, 549, 569 A.2d 793 (1990), the jury awarded the plaintiff $250,000 in compensatory damages and $750,000 in punitive damages, a ratio of three to one. That award was reversed because the Court found that the plaintiff had failed to meet his prima facie burden of reverse sex discrimination, and a new trial was ordered. Id. at 554-55, 569 A.2d 793. The disposition of the case after that order is not known. In Milazzo v. Exxon Corp., 243 N.J.Super. 573, 574, 580 A.2d 1107 (Law Div.1990), the plaintiff was *1170 awarded $100,000 in punitive and $276,144 in compensatory damages, a ratio of .36 to 1. In Levinson, supra, 868 F.2d at 559-561, the plaintiff received $2.3 million in punitive and $257,184 in compensatory damages, a ratio of 8.9 to 1. After a new trial on punitive damages was held, in 1990, the plaintiff received $1 million, reducing the ratio to 3.8 to 1. Lastly, in a case not cited, Jackson v. Consolidated Rail Corp., 223 N.J.Super. 467, 473, 538 A.2d 1310 (App.Div.1988), the jury awarded the plaintiff $1,000,000 in punitive and $600,000 in compensatory damages, a ratio of 1.6 to 1. On appeal, this court ordered a new trial and therefore, it is unknown whether the damages and ratio remained the same.
Even though in three of the cases just discussed, a new trial was ordered, thus rendering the amount of the punitive damages award in doubt in 1991, that is not to say those cases could not provide adequate notice. The cases indicated to the Bank that it could be liable for punitive damages in the neighborhood of a million dollars and at a multiple of close to four times compensatory damages. Thus, the case law provided the Bank with sufficient notice of the remitted punitive damages award of $1.8 million, which was six times compensatory damages.
It is more difficult to conclude that the Bank had notice of the unremitted award of $4 million, which was fourteen times compensatory damages, since none of the cited cases, after appeal, awarded punitive damages in the multi-million dollar range or in that ratio range.
We disagree with plaintiffs' inclusion of Mehlman v. Mobil Oil Corp., 291 N.J.Super. 98, 676 A.2d 1143 (App.Div.1996), aff'd 153 N.J. 163, 707 A.2d 1000 (1998) as providing notice because that case occurred after 1991, and therefore cannot be construed as relevant for purposes of notice.
Because we have concluded that the Bank had fair notice only of the remitted award, it is unnecessary to address in detail plaintiffs' argument that federal sentencing guidelines gave the Bank notice of the unremitted award. We, however, note that the guidelines were promulgated to provide federal courts assistance in sentencing criminal defendants, and are of dubious applicability to this civil setting.
The Bank's citations to numerous employment discrimination cases decided outside this State and the ratios discussed within are of little value. Punitive damages awards are exceptionally fact-specific, dependent on the conduct involved and even more importantly, the wealth of the defendant. See Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 339, 627 A.2d 1081 (1993) (stating that defendant's financial condition is relevant factor in all punitive damages awards because degree of punishment must be proportionate to means of defendant). Moreover, for virtually each case cited by the Bank in support of its argument that the remitted ratio in this case is too high, other cases have sustained even higher ratios. Compare, e.g., Ortiz-Del Valle v. Nat'l Basketball Assoc., 42 F.Supp.2d 334, 345 (S.D.N.Y.1999) (concluding that ratio of 58.3 to one was high), with Deters v. Equifax Credit Info. Serv., Inc., 202 F.3d 1262, 1272-73 (10th Cir.2000) (affirming ratio of fifty-nine to one).
We also agree with plaintiffs that there is little meaning behind the Bank's assertion that in New Jersey, no punitive damage awards in the million dollar range have survived appellate review. The Bank provides a list and brief summary of appellate cases in this State involving punitive awards under LAD. The summaries indicate that in many of the cases, the punitive *1171 awards were reversed on appeal. A closer review, however, indicates that virtually all of the awards were reversed, not because they were excessive, but for other reasons. See Cavuoti, supra, 161 N.J. at 131, 735 A.2d 548 (affirming Appellate Division reversal of award due to failure to give upper management charge); Mogull v. CB Commercial Real Estate Group, Inc., 162 N.J. 449, 474-75, 744 A.2d 1186 (2000) (remanding to Appellate Division to determine whether award complied with BMW and whether failure to give upper management charge was reversible error); Maiorino v. Schering-Plough Corp., 302 N.J.Super. 323, 354-55, 695 A.2d 353 (App.Div.) (reversing award because of failure to give upper management charge and because award was excessive), certif. denied, 152 N.J. 189, 704 A.2d 19 (1997); Spragg v. Shore Care, 293 N.J.Super. 33, 59-60, 679 A.2d 685 (App.Div.1996) (vacating award because of lack of evidence of malicious conduct); Granziel v. City of Plainfield, 142 N.J. 513, 665 A.2d 1106 (1995) (remanding for reconsideration in light of Rendine v. Pantzer, supra, 141 N.J. at 292, 661 A.2d 1202); Catalane v. Gilian Instrument Corp., 271 N.J.Super. 476, 500, 638 A.2d 1341 (App.Div.1994) (setting aside jury verdict and punitive damages award because of erroneous jury instructions), certif. denied, 136 N.J. 298, 642 A.2d 1006 (1994); Wachstein v. Slocum, 265 N.J.Super. 6, 23, 625 A.2d 527 (App. Div.), (ordering new trial on issue of damages resulting from retaliatory transfer), certif. denied, 134 N.J. 563, 636 A.2d 521 (1993); Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 124 (3d Cir.1999), (vacating punitive damages award because of failure to give upper management jury charge), cert. denied, 528 U.S. 1074, 120 S.Ct. 786, 145 L.Ed.2d 663 (2000).
An analysis of other cases is of minimal assistance and fails to support the Bank's assertion that the $1.8 million punitive damages award is grossly excessive. See Swinton v. Potomac Corp., 270 F.3d 794, 819 (9th Cir.2001) (stating that "[w]e find little comfort in trying to discern parameters from other cases because the circumstances vary so widely" and results only in a "scatter graph"), cert. denied, ___ U.S. ___, 122 S.Ct. 1609, 152 L.Ed.2d 623 (2002).
We are satisfied that the remitted, $1.8 million award did not violate the Bank's substantive due process rights. Since the Bank engaged in intentional misconduct, a punitive damages award exceeding the compensatory damages award by six times is not unreasonable or excessive. This conclusion is buttressed by the PDA, which imposes a cap of five times compensatory damages. Although the PDA does not apply to LAD actions, it is still somewhat helpful "as a normative measure of the limits of proportion." Baker, supra, 161 N.J. at 231, 736 A.2d 462. To exceed the PDA cap by a measure of one is not unreasonable or violative of the Bank's constitutional rights, especially when that cap does not even apply.
It remains for consideration whether a "less drastic remedy" would have been sufficient to both punish and deter the Bank. In BMW, supra, 517 U.S. at 584, 116 S.Ct. at 1603, 134 L.Ed.2d at 832, the Court added at the end of its discussion of other penalties that the punitive damages award could not be justified on the ground of deterrence because the lower court had not considered whether "less drastic remedies could be expected to achieve that goal." Through its remittitur, the trial court here concluded that a less drastic sanction of $1.8 million, as opposed to $4 million, was necessary. Nonetheless, the Bank still considers that amount to be excessive and argues that a smaller award would achieve the goals of deterring future misconduct, especially since the Bank is no *1172 longer in existence. The Bank merged with CoreStates in 1994, which subsequently was purchased by First Union Corporation. The Bank maintains that the award should have been no greater than $500,000, the amount awarded in Rendine v. Pantzer, supra, 141 N.J. at 292, 661 A.2d 1202.
In support of this contention, the Bank points to this court's unabridged opinion in this case, in which we compared this case to Rendine, concluding that the "circumstances here are as egregious as those in Rendine..." Baker, supra, No. A-488-96T5 at 48. The comparison made was in response to the Bank's argument that its conduct did not support a punitive damages award, finding that because the Bank's conduct was similar to the employer's conduct in Rendine, punitive damages were justified. Because Rendine involved a punitive damages award of only $500,000 (and compensatory damages of $450,000), the Bank thus contends that only $500,000 was justified in this case. Rendine, supra, 141 N.J. at 298, 661 A.2d 1202.
The argument is rejected. An award of punitive damages includes consideration on the financial condition of the defendant. In Rendine, a jury found that the Pantzer Management Company had intentionally discriminated against two of its employees on maternity leave. Id. at 298, 661 A.2d 1202. The employer promised them that their positions would be available after they returned, but replaced them during their leave; upon the plaintiffs' return, they were discharged. Id. at 301-03, 661 A.2d 1202. While the factual circumstances of Rendine are somewhat similar to this case, there is no indication that the employer in that case was of comparable financial value to the Bank. On the contrary, the facts indicate that the company was a relatively small, family-owned business, employing about twenty employees. Id. at 298-99, 661 A.2d 1202. Here, even taking into account the disputed valuation of the Bank at the time of the misconduct, the stipulated value was $280 million whereas the Bank claims now it was only worth $25.6 million, it appears reasonable to conclude that the Bank enjoyed a vastly greater valuation than the employer in Rendine. In short, the punitive damages award in Rendine is not comparable.
In sum, the remitted punitive damages award of $1.8 million, with a ratio of roughly six to one, did not violate the Bank's substantive due process rights. The Bank's conduct was sufficiently reprehensible to justify that award. Moreover, it received fair notice that it could be liable for an award in that range because N.J.S.A. 10:5-13 provides that a LAD plaintiff may recover punitive damages, and because case law indicated that an employer sued under LAD could pay a punitive damages award in the million dollar range.

III.
The Bank argues that the $4 million punitive damages award was clearly the result of prejudice, passion or mistake, requiring a new trial, and that the trial court erred in finding otherwise.
In Baker, supra, 161 N.J. at 231, 736 A.2d 462, the Supreme Court's remand instructions required the trial court to not only apply the standards outlined in BMW, but to also determine whether the punitive damages award reflected prejudice, passion or mistake, warranting a new trial on that issue.
The trial court found the following:
Based on the instructions, the evidence that the jury could have found credible and important, I cannot say on the facts of this case and the verdict that the award reflects a miscarriage of justice or prejudice, passion or mistake *1173 warranting a new trial on the amount of punitive damages.
While it's a sizeable award, considering the run of the cases presented to me by the plaintiff as well as the defendant's cases on the multiple, the amount does not rise to that level. And I'm satisfied that a new trial is not warranted and I don't believe that was even impliedly suggested by the Supreme Court in its decision.
A trial court may correct an excessive jury award through remittitur. Remittitur is encouraged where there is adequate support for the jury verdict, but where the excessiveness of the damages indicates that a miscarriage of justice has occurred. Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 499, 779 A.2d 1078 (2001). Remittitur is inappropriate when the damages award is so excessive that it suggests that the entire verdict was tainted. Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 231, 276 A.2d 861 (1971). On appellate review of the trial court's decision, a reviewing court must give due deference to the trial judge's "feel of the case." Baxter v. Fairmont Food Co., 74 N.J. 588, 600, 379 A.2d 225 (1977).
The Bank argues that the $4 million punitive damages award requires a new trial because it was the product of mistake, based upon the incorrect valuation of the Bank. The Bank maintains that the trial court erred in refusing to reconsider the issue of valuation and precluding the Bank from submitting new evidence of its value at the time of plaintiffs' termination. The Bank claims that its true value at that time was only $25.6 million, in contrast to the stipulated value of $438 million.
At trial, the Bank agreed to a stipulation of its value, based on the value of the Bank (at that time, known as the Constellation Bank Corporation) on March 16, 1994, the date it merged with CoreStates. The value of $280 million was derived from the number of shares CoreStates exchanged with the Bank. The court then informed the jury that the trading value of that stock, at the time of the trial, was $438.2 million.
As mentioned in this court's unabridged opinion in this case, the Bank agreed to a stipulated value because, after the jury concluded on July 2, 1996 that punitive damages could be awarded, the trial court informed counsel the next day that the parties should either stipulate to a value or proceed with witnesses. Baker, supra, No. A-488-96T5 at 57. The Bank had no witnesses and was unwilling for plaintiffs' expert witness to take the stand. The Bank thus argues that it only agreed to the stipulation because it was the lesser of two evils. The Bank further disputes the trial court's and this court's findings that it acted unreasonably in failing to provide discovery of its value and in stonewalling plaintiffs.
The trial court did not err in refusing to revisit the issue of valuation. Because the Supreme Court already ruled on this issue, its holding was the "law of the case," precluding any further litigation. That doctrine prevents the re-litigation of issues already decided on appeal and "most commonly applies to the binding nature of appellate decisions upon a trial court if the matter is remanded for further proceedings, or upon a different appellate panel which may be asked to reconsider the same issue in a subsequent appeal." Slowinski v. Valley Natl Bank, 264 N.J.Super. 172, 179, 624 A.2d 85 (App.Div. 1993). Although application of the doctrine is discretionary and may be relaxed, "`[p]rior decisions on legal issues should be followed unless there is substantially different evidence at a subsequent trial, new controlling authority, or the prior decision was clearly erroneous.'" Underwood *1174 v. Atlantic City Racing Ass'n, 295 N.J.Super. 335, 339, 685 A.2d 40 (App.Div. 1996), (quoting Atlantic Employers Ins. Co. v. Chartwell Manor Sch., 280 N.J.Super. 457, 470, 655 A.2d 954 (App. Div.1995)), certif. denied, 149 N.J. 140, 693 A.2d 110 (1997).
Here, there is no reason to conclude that the prior holding should not be followed. The Bank offers no substantially new evidence; even though it offers a new valuation, it makes the same argument for vacation of the punitive damages award as it did in its previous appeal. In its prior appeal, it contended that the jury valued the Bank at the wrong point of time at the time of its merger. In this appeal, it maintains that the jury's valuation was based on the Bank's net worth at the time of the merger. The Bank has failed to demonstrate a change of circumstances justifying a deviation from the law of the case doctrine.
Moreover, even if the law of the case doctrine were not followed, the trial court did not err in concluding that the punitive damages verdict was not so high as to indicate that it was tainted. "The test is whether, apart from the excessiveness of the award, there was `adequate support for the jury's finding on liability.'" Iacano v. St. Peter's Med. Ctr., 334 N.J.Super. 547, 556, 760 A.2d 348 (App.Div.2000) (citation omitted). Here, the trial court concluded sufficient evidence existed to support an award of punitive damages. The court had also found previously, in response to the Bank's prior motion to dismiss plaintiff's claim for punitive damages, that there was sufficient evidence of egregious conduct, demonstrated by Campbell's statement that plaintiffs "have to go" and the subsequent search for reasons to justify their termination. That finding was affirmed by this court, which concluded that the Bank engaged in devious and dishonest conduct. Similarly, although the Supreme Court did not discuss this issue in detail, it noted in its opinion that it affirmed the "remaining issues substantially for the reasons stated by the Appellate Division...." Baker, supra, 161 N.J. at 232, 736 A.2d 462. Since three courts have concluded that the jury verdict on punitive damages was adequately supported by the record, there is no reason to conclude that the punitive damages award was so tainted as to require a new trial.
The Bank argues that justice and due process demand that the correct value of the Bank be considered in determining whether either the $4 million or $1.8 million punitive awards were excessive. This issue is closely related to the issue of whether a "less drastic" remedy would have accomplished the goals of punishment and deterrence because if the Bank was actually worth less than its stipulated value, arguably, even the award of $1.8 million was excessive. Thus, the Bank argues that to ignore evidence of its correct value is an error of constitutional dimension.
Ordinarily, the "true" value of a defendant should always be considered in determining punitive damages, and the Supreme Court explicitly stated that in Baker, supra, 161 N.J. at 232, 736 A.2d 462. Thus, in the proper circumstances, the failure to consider a defendant's correct value may constitute reversible error. But here, the actual value was unavailable because the Bank refused to provide such a figure or assist in the ascertaining of such a number. Furthermore, the record indicates that the Bank was aware of the possibility of punitive damages and therefore should have been prepared to provide information on its value at trial. In May 1996, one month before trial, the Bank successfully moved to strike plaintiffs' discovery request for *1175 valuation information. While the Bank argues that the court order precluding discovery of valuation demonstrates an absence of stonewalling, it also evidences the Bank's clear notice that punitive damages would be at issue at trial, and that evidence of the Bank's value was necessary. After the jury determined punitive damages could be awarded, the Bank then made the strategic decision to decline to produce a valuation figure, and instead stipulated to a number.
In that context, we fail to see where the trial court engaged in an error of constitutional dimension by refusing to consider the Bank's value at the time of the wrongdoing. Indeed, because due process essentially involves considerations of fairness, see BMW, supra, 517 U.S. at 574, 116 S.Ct. at 1598, 134 L.Ed.2d at 826 (stating that "[e]lementary notions of fairness" are enshrined "in our constitutional jurisprudence"), there is no unfairness in holding the Bank to a valuation figure to which it voluntarily agreed. See Parrott v. Carr Chevrolet, Inc., 156 Or.App. 257, 965 P.2d 440, 454 (1998) (stating that defendant's decision to stipulate to its value did not preclude it from challenging amount of punitive award but "any detriment to defendant in assessing that awardeither by the jury or the reviewing courtis a consequence of defendant's own making"), rev'd in part on other grounds, 331 Or. 537, 17 P.3d 473 (2001).
The trial court did not err in concluding that the jury verdict on punitive damages was so tainted as to require a new trial.

IV.
The Bank argues that the trial court erred in ordering postjudgment interest on the punitive damages to run from the date of verdict, July 3, 1996. At the very least, the Bank contends that interest should not have run until July 26, 1996, the date the trial court entered the order of judgment, incorporating the jury verdict. The Bank further asserts that postjudgment interest should not have begun to run until all appeals in the matter had ended. That date was March 15, 2000, the date the Supreme Court denied the Bank's motion for reconsideration. Specifically, the Bank asserts that 12 U.S.C.A. § 91, and the stay of judgment entered by the court on September 13, 1996, both precluded the calculation of interest until March 15,2000. We disagree.
Rule 4:42-11(a) provides for postjudgment interest as follows: "Except as otherwise ordered by the court or provided by law, judgments, awards and orders for the payment of money, taxed costs and counsel fees shall bear simple interest...." Although the rule indicates that interest normally shall run from the date of judgment, it also provides a trial court with the discretion to vary the award, in the interests of equity. See, e.g., Interchange State Bank v. Rinaldi, 303 N.J.Super. 239, 264, 696 A.2d 744 (App.Div.1997) (stating that postjudgment interest rate may vary from legal rate when justice and fair dealing require).
Given that the court rule provides a trial court with latitude to deviate from the rule, the court did not abuse its discretion in ordering interest to accrue from the date of the jury verdict. See Kim v. Monmouth Coll., 320 N.J.Super. 157, 163, 726 A.2d 1017 (Law Div.1998) (ordering postjudgment interest to run from date of verdict). The fairness of the order is further demonstrated by the September 14, 1999 consent order, which made the compensatory damages verdict enforceable and apparently awarded interest from the date of the verdict. Although that order did not specifically state that interest ran from the date of the jury verdict, plaintiffs have so represented.
*1176 The Bank's remaining argument, that the stay of judgment and 12 U.S.C.A. § 91, prevented interest from running until all appeals had ended, is unpersuasive.
First, the Bank contends that 12 U.S.C.A. § 91 tolled the accrual of interest. On September 13, 1996, the trial court ordered a stay of the July 26, 1996 order, during "the pendency of all appeals in this matter." On October 25, 1996, the trial court issued an order discharging the judgment lien created by the July 26, 1996 order. The Bank was not required to post a bond, as required by R. 2:9-5(a), apparently because the Bank successfully argued that 12 U.S.C.A. § 91 precluded such a bond and required a stay.
Section 91 prevents a bank, contemplating insolvency, from making transfers "before final judgment in any suit, action, or proceeding, in any State, county or municipal court." The purpose of that specific section was to secure, in the event of insolvency, a just and equal distribution of assets of a national bank among its creditors. Mechs. Univ. Joint Co. v. Culhane, 299 U.S. 51, 55-56, 57 S.Ct. 81, 83-84, 81 L.Ed. 33, 36 (1936). Thus, it prevents prejudgment seizure of bank property by creditors. Third Nat'l Bank v. Impac Ltd., 432 U.S. 312, 323, 97 S.Ct. 2307, 2314, 53 L. Ed.2d 368, 377 (1977).
The Bank's rather attenuated argument depends solely on the holding in United States v. Lemaire, 826 F.2d 387 (5th Cir.1987), cert. denied, 485 U.S. 960, 108 S.Ct. 1223, 99 L.Ed.2d 423 (1988). There, the court stated that a state court judgment was not final unless it was "no longer subject to examination on appeal, either because of disposition on appeal and conclusion of the appellate process, or because of the passage, without action, of the time for seeking appellate review." Id. at 390. Accordingly, the Bank maintains that because the July 26, 1996 order did not become final until the conclusion of the appellate process, interest did not begin to run until that date, March 15,2000.
Lemaire is readily distinguishable. In Lemaire, the plaintiffs brought a successful breach of contract, fraud and tortious interference with contract suit against MBank Abilene. Id. at 387-88. After the trial court vacated its stay of enforcement of the judgment, and the state appellate court refused to consider the bank's writ of mandamus directing the trial court to give effect to 12 U.S.C.A. § 91, the plaintiffs caused writs of garnishment to be served on the Federal Reserve Bank of Dallas, which stopped clearance of MBank checks and threatened its solvency. Id. at 388. In response to this development, the Federal Deposit Insurance Corporation and Office of the Comptroller of the Currency filed suit against the plaintiffs, invoking 12 U.S.C.A. § 91 as the basis for a preliminary injunction prohibiting the plaintiffs from executing on the state court judgment during the pendency of the state court appeal. Ibid. The district court granted the relief, interpreting the statute's reference to "final judgment" meant a judgment from which no appeal could be taken. Id. at 388. The Fifth Circuit affirmed, reasoning that because § 91 was enacted to assure the orderly and fair liquidation of any national bank falling into insolvency, Congress intended to protect such banks from a seizure of property before the appellate process had been completed. Id. at 390.
Lemaire is of little persuasive value. First, the action in Lemaire threatened to make the bank insolvent, thereby implicating § 91. As pointed out, § 91 deals with transfers by banks during insolvency; indeed, the heading of that section reads: "[T]ransfers by bank and other acts in contemplation of insolvency." In this case, there is no indication that the payment of *1177 postjudgment interest will make the Bank insolvent. The Bank does not even make that argument. Second, Lemaire dealt with the propriety of a garnishment of a bank's assets, and whether such an execution should be stayed pending the bank's appeal of an adverse judgment. That is a very different proposition from whether a bank can be liable for postjudgment interest running during the pendency of the appeal period.
The Bank's second argument focuses on the court's September 13, 1996 stay of judgment. Because the court provided that the stay would remain in effect "during the pendency of all appeals in this matter," the Bank argues that the order of judgment was not in effect until all appeals had ended, which at the very earliest was March 15, 2000. Consequently, the Bank maintains that because New Jersey suspends the running of interest during the time that a stay is in effect, interest did not begin to run until the date the stay ended, March 15, 2000.
Interest is not suspended during a stay of judgment. The cases cited by the Bank deal with prejudgment and not postjudgment interest. See Curtis Mfg. Co. v. Plasti-Clip Corp., 933 F.Supp. 107, 119-20 (D.N.H.1995) (reducing prejudgment interest because of plaintiff's undue delay in prosecuting case), rev'd on other grounds, 135 F.3d 778 (Fed.Cir.1998); Prof'l Ins. Mgmt. v. Ohio Cas. Group of Ins. Cos., 246 B.R. 47, 68-70 (D.N.J.2000) (affirming bankruptcy court's decision not to suspend prejudgment interest during period of "judicial stay or delay"), order vacated, 285 F.3d 268 (3d Cir.2002).
This distinction is significant because prejudgment interest differs from postjudgment interest in the stay context. Rule 4:42-11(b) allows a trial court, "in exceptional cases," to suspend the running of prejudgment interest in tort actions. Thus, where postjudgment interest is awarded almost automatically, "as a matter of long-standing practice" in all money judgments, a trial court possesses more discretion in deciding whether or not to stay an award of prejudgment interest. See Mehta v. Johns-Manville Prods. Corp., 163 N.J.Super. 1, 6, 394 A.2d 129 (App.Div.1978) (stating that court may suspend interest in cases where award would not constitute fair compensation to plaintiff for money withheld).
Even in the prejudgment interest context, a court may suspend interest during the pendency of a stay only in "exceptional cases," and in the interests of fairness. Here, the Bank has failed to show that it is an exceptional case and that it would be unfair to provide plaintiffs with interest accruing from the date of the jury verdict. Since both the Supreme Court and this court have concluded that plaintiffs are entitled to an award of punitive damages, it is entirely equitable to provide plaintiffs with interest on that award, running from the date the jury first determined they were entitled to such damages. See Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835-36, 110 S.Ct. 1570, 1575-76, 108 L.Ed.2d 842, 852 (1990) (stating that postjudgment interest compensates "`the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant' ") (citation omitted); see also Johansen v. Combustion Eng'g, Inc., 170 F. 3d 1320, 1339 (11th Cir.) (holding that postjudgment interest on remitted punitive damages award ran from date of entry of initial judgment because that was date damages were sufficiently ascertained), cert. denied, 528 U.S. 931, 120 S.Ct. 329, 145 L.Ed.2d 256 (1999).
The trial court did not abuse its discretion in awarding plaintiffs postjudgment *1178 interest on their punitive damages award, accruing from the date of the jury verdict.
Affirmed on both the direct and cross-appeals.
NOTES
[1] N.J.S.A. 10:5-14.1A was amended by L. 2001, c. 254 § 1, eff. Nov. 15, 2001 to increase the penalties.