**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5520-14T3

L.S.,

    Plaintiff-Respondent,

v.

JONATHAN FELLUS, M.D.,

    Defendant-Appellant,

and

KESSLER INSTITUTE FOR
REHABILITATION, INC. and
KESSLER PROFESSIONAL SERVICES,
LLC,

    Defendants.

_____

Argued September 13, 2016 — Decided November 3, 2017

Before Judges Fisher, Ostrer and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-7684-10.

Evan L. Goldman argued the cause for appellant (Goldman, Davis & Gutfleish, PC, attorneys; Mr. Goldman, on the briefs).

Dennis M. Donnelly argued the cause for respondent (The Donnelly Law Firm, LLC, attorneys; Mr. Donnelly, on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

Plaintiff (whom we identify by initials to protect her privacy) sued Jonathan Fellus, M.D., her former physician and neuro-rehabilitation specialist, for mental health injuries he caused when he engaged in a sexual relationship with her while treating her for a brain injury. At trial, plaintiff claimed — in what defendant asserted was a delusion — that he began stalking and tormenting her three years after he terminated both the sexual and professional relationships. To challenge the truth of plaintiff's allegation, defense counsel asked plaintiff to speculate about what prompted defendant to stalk her after so much time passed. Plaintiff answered, "I refused an offer for $750,000 . . . ."

Defense counsel swiftly objected and sought a mistrial. The trial judge sustained the objection, but denied the mistrial request, concluding that his curative instructions prevented any prejudice. After the jury returned a verdict of $1.5 million in compensatory damages, and $1.7 million in punitive damages, defendant again argued, this time in support of a new trial motion, that mentioning the alleged settlement offer deprived him of a fair trial. The judge disagreed, concluding he delivered

appropriate curative instructions, which the jury perforce followed.

In deciding whether the trial court mistakenly exercised its discretion in denying a mistrial and new trial motion, we must consider the efficacy of a curative instruction when a jury hears evidence of an alleged settlement offer, which, as it happens, defendant never even made. Under the totality of the circumstances, we conclude the court's instruction sufficed, the court's determination to deny a mistrial or a new trial is worthy of our deference, and reversal is not required to avoid a manifest injustice. We also reject defendant's other challenges to the judgment, except we are constrained to remand for further findings regarding the punitive damage award.

I.

Defendant admitted he engaged in a sexual relationship with plaintiff, then thirty-three years old, who sought his treatment following an automobile accident. He also admitted the relationship violated his professional and legal duties. Thus, liability was not at issue in the bifurcated trial of compensatory and then punitive damages.

The sexual relationship spanned several months. It started with petting in an examination room at the hospital where defendant was a department head; and progressed to sexual intercourse at his

3    A-5520-14T3

home and a Newark hotel.  Shortly after defendant told plaintiff he was breaking it off, she learned she was pregnant.  Defendant successfully persuaded plaintiff to terminate her pregnancy.  And he paid for the abortion.  Despondent thereafter, plaintiff evidenced suicidal ideation, leading to her brief commitment to a mental health hospital.  Upon her release, she returned to defendant as her treating physician.  During that post-hospitalization visit, she performed oral sex on him.  That was her last visit with defendant.

In various ways, the jury could find that defendant made this obviously bad conduct worse.  There was sufficient evidence for the jury to conclude he exploited a susceptible patient; pushed aside impediments to the sexual relations; continued despite signs he was harming plaintiff; and took actions that served his own self-interest rather than his patient's.

Plaintiff was no ordinary patient.  As defendant determined, she had an apparent mild traumatic brain injury, plus various related ailments and conditions, including elements of post-traumatic stress disorder, and seizure-like activity.  That made her vulnerable to abuse, and susceptible to harm.[1]  Physicians

---

[1] In an apparent effort to blunt plaintiff's damage claim, the defense elicited evidence of plaintiff's behavioral problems before she sought treatment from defendant.  That was obviously a double-edged sword, as the jury may have concluded that plaintiff's

like defendant, who provide psychotherapeutic treatment, are subject to heightened restrictions on sexual relationships with patients, which are nonetheless banned for all physicians. <u>See</u> <u>N.J.A.C.</u> 13:35-6.3. Despite all that, defendant engaged in sexual contacts with plaintiff.

After defendant's physical advances at the first office visit, plaintiff appeared with her mother at the next visit. Yet, defendant was able to exclude the mother from the examining room, enabling him to continue his inappropriate physical contacts. A couple days following that visit, plaintiff had a seizure-like episode. Nonetheless, defendant persisted in his behavior at a third office visit, after which plaintiff had another seizure-like episode. The hospital eventually terminated her treatment because she was a fall risk.

Before engaging in sexual intercourse with plaintiff at defendant's house, plaintiff said she felt he commanded her to drink wine. Defendant knew it was contraindicated for the prescription drugs she was taking. When she became pregnant, plaintiff said he insisted she have an abortion, stating it would ruin his career, and threatened that he would "not be there" for

---

pre-existing condition made her more vulnerable, and defendant's actions more reprehensible, than they otherwise would have been.

her. He did not accompany her to the termination. Nor did he tell her to get counseling in its aftermath.

Plaintiff was despondent and continued seeing a psychologist — in fact the one who referred her to defendant in the first place. The psychologist concluded plaintiff was not a danger to herself. However, he was unaware of the abortion. During the days after it, the psychologist conferred with defendant, but he did not disclose it. Thereafter, plaintiff locked herself in her room with her father's firearms. Her hospital commitment followed.

Plaintiff believed that defendant interfered with her treatment by physicians she saw after her last visit with him. Although defendant denied he contacted plaintiff's doctors after she stopped seeing him, he was confronted with emails he exchanged with a physician plaintiff saw at New York University soon after his treatment of plaintiff ended. Plaintiff stopped seeing that physician because she believed defendant was interfering with her treatment. Defendant also contacted plaintiff's referring psychologist after plaintiff's last visit, but never revealed to him that he had a sexual relationship with plaintiff. Plaintiff testified that she was getting some help with her seizures from her current physician, but had not disclosed her relationship with defendant, out of fear that it would affect the physician's treatment.

About a year-and-a-half after the end of their relationship, plaintiff sued defendant and the hospital where he treated her. Defendant initially denied the allegations of a sexual relationship, and did so to the hospital as well. After the hospital fired him, he found a job at another hospital, without disclosing the details of his relationship with plaintiff. That second hospital ultimately terminated defendant. About five-and-a-half years after his last sexual encounter with plaintiff, the New Jersey Board of Medical Examiners revoked his license to practice medicine.

Thus, the jury could conclude that despite the apparent reverberations of his sexual relations with plaintiff, defendant made silence and preserving his professional and marital relationships more important than disclosing the affair and securing help for plaintiff. Although defendant readily admitted at trial that he violated his professional responsibility, he denied he was a predator and claimed he "fell for" plaintiff. Yet, even the cold trial record of his testimony reflects an apparent effort to shift some blame to plaintiff for the sexual relationship, and to minimize his responsibility for events that followed. That apparently did not sit well with the jury.

In his opening statement in the compensatory damage phase, defense counsel conceded that defendant's actions caused plaintiff

harm, and suggested that the issue at trial was how much. However, in closing, the defense seemed to argue that plaintiff had failed to prove she was entitled to any compensatory damages.

Experts from the two sides disagreed about the behavioral health consequences of defendant's actions. Peter C. Badgio, Ph.D., a psychologist, and Peter M. Crain, M.D., a neurologist, testified for plaintiff. Three years after treatment with defendant ended, and four years after the auto accident, Dr. Badgio opined that plaintiff suffered from a "conversion disorder," meaning her psychological issues were converted into a physical complaint, specifically, seizures. Dr. Badgio testified that plaintiff had issues with judgment and impulsivity. He concurred in defendant's diagnosis, reported in his medical records, that plaintiff suffered from brain damage. Dr. Badgio testified plaintiff was not able to act in her best interests, or handle the relationship with defendant. He opined that defendant's actions had a "devastating" impact on plaintiff.

Dr. Badgio found that plaintiff had major depression, which was concealed by her conversion disorder, but was a "direct result of [plaintiff's] experiences with [defendant] and [their] consequences." Dr. Badgio concluded that plaintiff's conversion disorder started before she began seeing defendant, but persisted because of defendant; and the chances of it improving were

"guarded" because of plaintiff's mistrust of medical professionals due to defendant's actions.

Dr. Badgio saw plaintiff a second time three years later, and found the emotional problems she suffered as a result of her interaction with defendant had worsened. Plaintiff was no longer suppressing her depression with physical symptoms, and her symptoms were manifesting into paranoia. Dr. Badgio stated that the paranoia made it hard for plaintiff to seek help and get better. Although anti-psychotic medication might assist her in entering a positive therapeutic relationship, Dr. Badgio thought the chances were "very slim." Dr. Badgio also believed defendant contributed to the severity and persistence of plaintiff's seizures, and was the cause of plaintiff's "downhill trajectory." Dr. Badgio concluded that plaintiff's delusions were a result of her post-traumatic experiences with defendant.

Dr. Crain first examined plaintiff four years after the end of defendant's treatment. He concluded in a report that "[a]s a result of a sexual affair with [defendant] while under his care, a resulting pregnancy, followed by an abortion — and the breakup of their complicated relationship," he diagnosed plaintiff with "exacerbation of emotional dysregulation of a traumatic brain injury" and "adjustment disorder with depressed mood." Although

Dr. Crain initially believed these conditions were "permanent in nature," he later testified he was wrong about that.

When Dr. Crain examined plaintiff a second time two years later, he diagnosed plaintiff with delusional disorder of a persecutory or paranoid nature. As a result, plaintiff would not "consider treatment with" medical professionals because of her delusion that defendant would influence any doctor she saw. Dr. Crain testified that plaintiff's delusions magnified after she filed a claim with the Board of Medical Examiners. Dr. Crain concluded that plaintiff no longer suffered from the seizures she experienced as a result of the car accident, but that she suffered from a delusional disorder, which was "psychosis." He testified that medication could "substantially reduce" plaintiff's delusions, but that she had not been prescribed any medication because she refused to see a psychiatrist due to her distrust of mental health professionals that was caused by defendant. Dr. Crain testified that this second diagnosed condition was permanent and caused solely by defendant.

Defense expert Barry Rosenfeld, Ph.D., a forensic psychologist, examined plaintiff over five years after the relationship between plaintiff and defendant ended. Dr. Rosenfeld found that plaintiff did not exhibit any signs of deliberately fabricating her symptoms in an attempt to punish defendant or

bolster her litigation. Unlike plaintiff's experts, he found no evidence of a delusional disorder. He concluded plaintiff had psychosomatic symptoms, suggesting conversion of psychological symptoms into medical symptoms. He explained that plaintiff "genuinely believes she has a seizure disorder" that is "not physical in nature" but is "psychological in nature." Dr. Rosenfeld did not see any evidence to suggest that plaintiff's conversion disorder was related to her interactions with defendant, because the symptoms began before she met defendant, and they did not noticeably worsen until years after plaintiff and defendant ended their relationship.

As noted, the jury awarded plaintiff $1.5 million in compensatory damages. Defendant was the sole witness in the punitive damages phase, which resulted in a $1.7 million award.

Defendant raises the following points on appeal:

POINT I

DURING CROSS EXAMINATION, PLAINTIFF STATED WHEN ASKED A QUESTION AS TO WHY SHE WAITED SO LONG TO REPORT CERTAIN BEHAVIOR TO THE POLICE, "I REFUSED AN OFFER FOR $750,000.00." ALTHOUGH A CURATIVE INSTRUCTION WAS GIVEN, THIS WAS CAUSE FOR AN IMMEDIATE MISTRIAL WHICH WAS REQUESTED AND THE COMMENT MADE BY PLAINTIFF (INACCURATE AS IT WAS) HAD THE EFFECT OF TAINTING THE TRIAL, WHICH RESULTED IN A COMPENSATORY VERDICT IN THE AMOUNT OF $1,500,000.

<u>POINT II</u>

THE AWARDS OF $1,500,000 FOR COMPENSATORY DAMAGES AND $1,700,000 FOR PUNITIVE DAMAGES WERE SO EXCESSIVE AND NOT BASED UPON ANY REASONABLY RELIABLE EVIDENCE. FOR THIS REASON, THE TOTAL VERDICT SHOCKS THE CONSCIENCE AND A NEW TRIAL MUST BE ORDERED ON ALL ISSUES.

A. Under The Law Regarding Punitive Damages, It Is Clear That The Verdict Of $1,700,000 Was Excessive Based Upon The Factors That The Jury Should Consider When Determining The Amount Of The Award.

<u>POINT III</u>

PERMANENCY WAS NOT IN THE CASE. NO DOCTOR TESTIFIED AS TO PERMANENCY, AND THE CLOSEST THAT ANY DOCTOR CAME WAS WHEN DR. CRAIN STATED THAT THE PLAINTIFF'S PROGNOSIS WAS POOR. NO FURTHER EXPLANATION WAS GIVEN. PLAINTIFF'S COUNSEL DID NOT ARGUE PERMANENCY IN HIS SUMMATION. YET THE COURT CHARGED THE JURY WITH A PERMANENCY CHARGE, ALLOWING THEM TO DECIDE HOW LONG INTO THE FUTURE THE INJURIES ARE REASONABLY LIKELY TO LAST. EVEN THOUGH THIS WAS NOT OBJECTED TO BY COUNSEL AT THE TIME, THIS WAS PLAIN ERROR AND THEREFORE REVERSIBLE.

<u>POINT IV</u>

DURING HIS OPENING STATEMENT TO THE JURY IN THE PUNITIVE DAMAGE PHASE OF THE TRIAL, PLAINTIFF'S COUNSEL ARGUED THAT BY ITS VERDICT THE JURY SHOULD "SEND A MESSAGE TO DOCTORS" THAT THIS TYPE OF BEHAVIOR SHOULD NOT BE PERMITTED. THIS STATEMENT WAS IMMEDIATELY OBJECTED TO BY COUNSEL AND AFTER IT WAS SUSTAINED PLAINTIFF'S COUNSEL MODIFIED HIS STATEMENT TO "SENDING A MESSAGE TO DR. FELLUS." "SENDING A MESSAGE" IS CLEARLY AN IMPERMISSIBLE STATEMENT AND WARRANTS A NEW TRIAL.

POINT V

PRIOR TO ENTERING A JUDGMENT ON THE ISSUE OF
PUNITIVE DAMAGES, THE COURT WAS REQUIRED TO
DETERMINE THE "REASONABLENESS" OF THE AWARD.
AS THE COURT DID NOT DO THIS, DESPITE A REQUEST
TO DO SO, THERE MUST BE A NEW TRIAL ON THE
ISSUE OF PUNITIVE DAMAGES.

II.

A.

The only issue worthy of extended discussion is defendant's argument that plaintiff's disclosure of an alleged settlement offer caused irremediable prejudice. As noted above, plaintiff's experts testified that she had begun to suffer from paranoia and delusions. They also testified that defendant caused this condition, by engaging in the sexual relationship, and ending it the way he did. Plaintiff did not recognize her perceptions as delusions. She testified that she began to perceive that defendant was stalking her beginning in 2011 or 2012. She claimed he was responsible for hacking her computer; stalking her; sending people to her gym to mock her, or intimidate her by striking poses that would remind her of defendant.

During cross-examination, defense counsel asked a series of open-ended questions, culminating with:

> Q    Okay. So, do you know what prompted
> [the stalking] four years ago as opposed to
> why it didn't start six years ago?
>
> A.    I refused an offer for $750,000 —

[DEFENSE ATTORNEY]: Objection, Your Honor, objection. Can we approach sidebar, please?

THE COURT: Yes. Excuse us.

After an unrecorded sidebar, at which defense requested, and the court denied, a mistrial, the judge gave a curative instruction. Although the court sustained defendant's objections, the court did not expressly instruct the jury to disregard plaintiff's statement, nor limit its use in any way. Rather, apparently unintentionally, the judge instructed the jury that what plaintiff said from the witness stand was admissible, but the issue plaintiff raised would not be pursued further. He stated:

> THE COURT: All right, the objection is sustained. <u>That's an area that will not be further delved into.</u> Keep in mind, ladies and gentlemen, and I'll tell you this — I told you this before and I'll tell you again. What lawyers say and in the course of their asking a question, when they say something, merely because they say it doesn't make it so. They are not testifying. What they offer is not evidence. <u>What is evidence is what comes from the witness stand as a result of any question that they might ask or as a result of any — any evidence.</u> Keep — documentary evidence that I may allow into evidence, okay. If there's a question being asked of the witness and I don't overrule the question before the question is asked, because I don't know what the question is, or before the answer is made, then you'll get to hear the answer to the question. Please continue.
>
> [(Emphasis added).]

14

The cross-examination continued briefly and the court recessed for the day.

The next morning, defense counsel renewed his request for a mistrial, which the court denied. Plaintiff's counsel expressed reservations about any curative instruction, because it would reinforce the prejudice of plaintiff's remark. However, the judge expressed his confidence in the jury's ability to follow instructions. The judge's curative instruction corrected his statement made the previous afternoon, and expressly directed the jury to disregard any and all testimony about settlement offers — apparently referring not only to plaintiff's most recent allegation, but also to the prior testimony from defendant. Defendant had admitted he asked the Board of Medical Examiners to let him keep his license so he would be in a position to compensate plaintiff. He also testified, without objection, that after he was sued, he was unsure how the case would be resolved, and whether he would have insurance. He stated he thought the case might be susceptible to a cash settlement.

The judge explained that courts encourage settlement, because it serves parties' interests and spares juries the burden of service. Yet, settlement discussions should have no impact on determining a party's liability to pay damages to another. We quote the curative instruction at length:

15                                                    A-5520-14T3

THE COURT: One thing I have to do before we resume testimony. During the course of the testimony, you heard, a couple of times, you — you may or — may or may not have heard a couple of times, I know I did more than once here, some testimony from witnesses with regard to the ability or lack thereof to resolve this case short of a jury verdict. Well, what we call settlement.

Now, I'm sure you all recognize the fact that a settlement is a way of life in the litigation area. It's just to — it's in the parties' best interests and the courts encourage the ability of parties to be able to resolve a case without — by settlement without the necessity of having a trial and having — inconveniencing you all and — but, the ability to do that and the ability to have a trial is really the fundamental part of our system. When — while we encourage resolution short of a trial, we — we understand, as a matter of law, that that is — that that occurs and yet, at the same time, we also understand that the fact of it occurring has absolutely nothing to do with the determination as to whether or not there is a legitimate cause of action. In other words, a liability on the part of a defendant, any given defendant, to pay damages to any given plaintiff.

The fact that there's — there is ever any discussion with regard to resolution is not something that we can properly take into consideration in determining the issues that a jury and a judge has to determine. It plays no part and it cannot and should not play any part in a jury's consideration or a judge's consideration, for that matter.

So as a result, no one is permitted to talk about — I think I mentioned many times that — to keep in mind that — that what lawyers tell you is not evidence. What is evidence is what comes from the witness stand. But what I probably failed to tell you, and I'm

16

telling you now, is that <u>sometimes, you hear statements from the witness stand that has no business being considered as a matter of law by you or me. Those kinds of things — an example of that that we have heard here is any comments with regard to settlement in — of this case.</u> It obviously has not been settled.

And so here we are. <u>And we can't take into any consideration whether or not there has been any settlement discussions, any resolution or lack thereof, and what — what was the cause of it, what was the — the parameters in which it was — none of that is an — is our business.</u> Our business is to reach a conclusion based upon the evidence that's presented and my instructions as to the law and nothing short or — nothing short of that and nothing greater than that. Which is one of the reasons why I tell you not to discuss the case among yourselves, certainly not with anyone else, not to look up anything on the internet because it's only what you hear here in the courtroom.

Now, sometimes you'll hear things in the courtroom that you're not supposed to take into consideration. And it's my job to tell you not to take that into consideration. And that's what I'm telling you now. <u>To the degree to which you heard anything with regard to resolution of this case by anyone in any manner in any degree or anything about it, you may not consider that in the course of your deliberations.</u>

And what I even ask you to do — I'm going to go to the extent right now to ask you to — since in this case, you're allowed to take notes, to take a minute. You may remember and may not actually have to do it. But to the degree to you don't remember or just to be sure, take a minute now and review your notes and see — and make sure that <u>if you did say anything in your notes or write anything in your notes with regard to any settlement</u>

> conversations that anybody had with regard to
> the testimony, cross it out. Okay? Take that
> time now. Nobody feels the need to do that?
> If you do, take a minute right now.

In support of a new trial motion, defense counsel again argued that plaintiff's reference to an alleged settlement offer was prejudicial. He contended that the jury must have relied on the alleged $750,000 offer, because it awarded precisely twice that amount in compensatory damages. He also argued that the alleged offer tainted the punitive damage award by leading the jury to believe that defendant was able to pay at least a $750,000 award, even though his financial statement indicated a total net worth of slightly less than that amount.

The court denied the new trial motion. The judge found that "defendant's outrageous behavior" as presented "throughout the trial" "clearly justified" the award. Thus, defendant failed to demonstrate, under Rule 4:49-1, "clearly and convincingly . . . a miscarriage of justice under the law." The court found that the quantum of damage did not shock the conscience, citing He v. Miller, 207 N.J. 230 (2011).

With regard to plaintiff's reference to an alleged settlement offer, the judge noted that "trials are messy things," and plaintiff's statement "arose out of defense counsel's repeated use of open ended questions in cross examination." The court surmised that none of the jurors even recorded plaintiff's remarks in their

18

notebooks, because he observed that they did not react when he directed the jury to cross out any notes of plaintiff's remarks. The judge found that its curative instruction sufficed to remediate any prejudice:

> The Court immediately and effectively addressed the comment directing the jury to disregard the improper reference and did so without unduly bringing attention to the content. I'm satisfied the problem was adequately addressed.
>
> . . . .
>
> This jury paid careful attention to the Court's charge as well as its instructions throughout the trial, including any curative instructions.

### B.

On appeal, defendant renews his argument that the judge's instruction was ineffective. He contends that plaintiff's disclosure was too prejudicial to be curable. Plaintiff disagrees, contending that we should defer to the trial judge's feel of the case, his assessment of the impact of the testimony, and the effectiveness of his instruction.

### 1.

We consider first our standard of review of a trial judge's denial of a mistrial and a motion for a new trial. The Court in State v. Winter, 96 N.J. 640, 646-47 (1984) addressed the specific issue posed here — "[t]he decision on whether inadmissible evidence

is of such a nature as to be susceptible of being cured by a cautionary or limiting instruction, or instead requires the more severe response of a mistrial . . . ." The Court held the decision "is one that is peculiarly within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting." Id. at 647. Consequently, "[a] motion for a mistrial is addressed to the sound discretion of the [trial] court; and the denial of the motion is reviewable only for an abuse of discretion." Ibid. (quoting State v. Witte, 13 N.J. 598, 611 (1953)); see also State v. Harvey, 151 N.J. 117, 205 (1997) (stating an appellate court must find "an abuse of discretion that results in a manifest injustice" to overturn a trial court's mistrial ruling). The same deferential standard that applies to the mistrial-or-no-mistrial decision, applies to review of the curative instruction itself. Winter, supra, 96 N.J. at 647.

Although we apply the same standard to a new trial motion that the trial court does — whether it "clearly and convincingly appears that there was a miscarriage of justice under the law," R. 4:49-1(a) — we do not write on a clean slate. Here, too, we "must afford 'due deference' to the trial court's 'feel of the case,' with regard to the assessment of intangibles, such as witness credibility." Jastram v. Kruse, 197 N.J. 216, 230 (2008)

(quoting Feldman v. Lederle Labs., 97 N.J. 429, 463 (1984)). "[I]t is the trial judge who sees and hears the witnesses and attorneys, and who has a first-hand opportunity to assess their believability and their effect on the jury." Ibid.

In particular, a trial court is in the best position to assess the impact of an evidentiary ruling. In Crawn v. Campo, 136 N.J. 494, 512 (1994), the trial court held, in the midst of trial, that the plaintiff's counsel's improper comment did not warrant a mistrial, but, at the end of trial, the trial court concluded that its ruling, in conjunction with other erroneous rulings, warranted a new trial. Based on the trial court's ability to assess the witnesses' credibility, the Supreme Court held, "Deference should be accorded to the trial court's conclusion concerning the prejudice attributable to the" trial court's rulings and "the extent to which that prejudice contributed to an unjust result." Ibid.

2.

We recognize the tension in our case law governing curative and limiting instructions. The authority is legion that courts presume juries follow instructions. See e.g., State v. Loftin, 146 N.J. 295, 390 (1996) ("That the jury will follow the instructions given is presumed."). The presumption is founded in part on necessity. "[T]he courts must rely upon the jurors'

ability and willingness to follow the limiting instruction without cavil or question." State v. Manley, 54 N.J. 259, 270 (1969). The presumption is "[o]ne of the foundations of our jury system . . . ." State v. Burns, 192 N.J. 312, 335 (2007).

Yet, some view the presumption as a myth. "The naïve assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction." State v. Boone, 66 N.J. 38, 48 (1974) (quoting Krulewitch v. United States, 336 U.S. 440, 453, 69 S. Ct. 716, 723, 93 L. Ed. 790, 799 (1949) (Jackson, J., concurring)). Noting, if not adopting that skeptical view, our Supreme Court has found, "There are undoubtedly situations in which notwithstanding the most exemplary charge, a juror will find it impossible to disregard such a prejudicial statement." Ibid. In Boone, for example, the Court found that the admission of the defendant's prior but withdrawn guilty plea presented such a situation. 66 N.J. at 50.

The United States Supreme Court reached the same conclusion regarding the admission of a co-conspirator's confession that implicates a defendant. "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot

be ignored." Bruton v. United States, 391 U.S. 123, 135, 88 S. Ct. 1620, 1627, 20 L. Ed. 2d 476, 485 (1968).

Without delving into the numerous empirical studies on jury behavior, we are satisfied that jury compliance is neither truth nor fiction. It is somewhere in between. As one scholar has noted, "The reality is . . . that evidentiary instructions probably do work, but imperfectly, and better under some conditions than others . . . ." David A. Sklansky, Evidentiary Instructions and the Jury as Other, 65 Stan. L. Rev. 407, 409 (2013) (Evidentiary Instructions) (reviewing jury behavior research); see also id. at 423-39 (analyzing various empirical studies).

The decision to opt for a curative or limiting instruction, instead of a mistrial or new trial, depends on at least three factors. First, a court considers the nature of the evidence and how toxic it really is. "The adequacy of a curative instruction necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached." Winter, supra, 96 N.J. at 647. Evidence that bears directly on the ultimate issue before the jury may be less susceptible to curative or limiting instructions than evidence that is indirect, and requires additional linkages.

For example, distinguishing between a co-conspirator's confession that directly implicates a defendant, and a confession

that only inferentially does so, the United States Supreme Court noted that "[s]pecific testimony that 'the defendant helped me commit the crime' is more vivid than inferential incrimination, and hence more difficult to thrust out of mind." Richardson v. Marsh, 481 U.S. 200, 208, 107 S. Ct. 1702, 1708, 95 L. Ed. 2d 176, 186 (1987). Consequently, "with regard to inferential incrimination, the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget." Ibid.

Second, the instruction's effectiveness depends on the instruction itself — its timing and its substance. Our Court has held that a swift and firm instruction is better than a delayed one. Winter, supra, 96 N.J. at 648 (noting the importance of an immediate and firm instruction to disregard an offending remark); see also State v. Vallejo, 198 N.J. 122, 134-35 (2009) (citing cases finding effective curative instructions). Delay may allow prejudicial evidence to become cemented into a storyline the jurors create in the course of the trial. See Evidentiary Instructions, supra, at 422 n.52. That is why our Supreme Court has stated — in the context of admitting other crimes evidence under N.J.R.E. 404(b) — it is the "better practice" to give limiting instructions at the time the evidence is presented and again in the final jury

charge. State v. Blakney, 189 N.J. 88, 93 (2006). It is thought the repetition of the instruction prevents the jurors from "indelibly brand[ing] the defendant as a bad person" and blinding them from careful consideration of all of the evidence in deliberations. Ibid.

Furthermore, a specific and explanatory instruction is more effective than a general, conclusory one. "The Court has consistently stressed the importance of immediacy and specificity when trial judges provide curative instructions to alleviate potential prejudice to a defendant from inadmissible evidence that has seeped into a trial." Vallejo, supra, 198 N.J. at 135. In the case of limiting instructions, the court must tell the jury precisely what the evidence may be used for, as well as what it may not be used for. State v. Cofield, 127 N.J. 328, 341 (1992) (pertaining to N.J.R.E. 404(b) evidence).

An instruction is also more effective when it explains itself. "Because I said so," is likely to be even less effective with a jury than it is when a parent says it to an eight-year-old. See Evidentiary Instructions, supra, at 439 (stating, based on a review of empirical research, that instructions "work better when the judge gives the jury a reason to follow them"); Id. at 452 (noting, subject to exception, that "[o]n the whole, mock jury studies do

25

suggest that evidentiary instructions are more apt to be followed if the judge explains the reason for the underlying rule").[2]

Third, a court must ultimately consider its tolerance for the risk of imperfect compliance. See Bruton, supra, 391 U.S. at 135, 88 S. Ct. at 1627, 20 L. Ed. 2d at 485 (referring to "consequences of failure so vital" to a criminal defendant). Yet, even in criminal cases involving errors of constitutional dimension, "not 'any' possibility [of an unjust result] can be enough for a rerun of the trial." Winter, supra, 96 N.J. at 647. "The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Ibid. (quoting State v. Macon, 57 N.J. 325, 336 (1971)). By contrast, a non-constitutional error "shall be disregarded by the appellate court 'unless it is of a nature as to have been clearly capable of producing an unjust result . . . .'"

---

[2] Some of our evidence rules, such as those pertaining to hearsay, are designed to exclude inherently unreliable evidence. Others, such as privileges, exclude probative evidence in service of other policy goals. This difference may affect compliance with a curative instruction. For example, a judge could explain in detail why our system excludes an incriminatory patient-to-physician statement — to encourage candor and protect privacy in the health care relationship. But, since that does not pertain to the evidence's probative value, the explanation may be less successful in persuading a jury to disregard it, than, say, an explanation as to why a hearsay statement is inherently unreliable, and should be disregarded.

Winter, supra, 96 N.J. at 648 (quoting State v. LaPorte, 62 N.J. 312, 318-19 (1973)).

Finally, based on our deferential standard of review, an appellate court shall not lightly disturb a trial judge's determination that the jury will obey a curative instruction. The trial judge has the benefit of his or her feel of the case, including observations of the jury throughout the trial. Notably, the United States Supreme Court has required an "overwhelming probability" that the jury cannot comply, before concluding a curative instruction was inadequate. Richardson, supra, 481 U.S. at 208, 107 S. Ct. at 1708, 95 L. Ed. 2d at 186; see also Greer v. Miller, 483 U.S. 756, 766 n.8, 107 S. Ct. 3102, 3109 n.8, 97 L. Ed. 2d 618, 630 n.8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant[]" (citing Richardson, supra, 481 U.S. at 208, 107 S. Ct. at 1708, 95 L. Ed. 2d at 186, and Bruton, supra, 391 U.S. at 136, 88 S. Ct. at 1628, 20 L. Ed. 2d at 485)).

Applying these principles, we shall not disturb the trial court's denial of defendant's requests for a mistrial and a new trial.

Regarding the nature of the evidence, we decline to find that plaintiff's disclosure of an alleged settlement offer caused irremediable prejudice. Evidence of settlement discussions is inadmissible "to prove liability for . . . or amount of the disputed claim," but not "when offered for another purpose . . . ." N.J.R.E. 408. Plaintiff's statement was clearly not offered to establish liability, which was conceded, nor the amount of her damages. It was offered to explain why plaintiff thought defendant had decided to stalk her. She believed he was retaliating because she refused his offer.

The appropriate frame of reference for deeming the statement inadmissible is N.J.R.E. 403, which permits the judge to exclude relevant evidence whose probative value is "substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury . . . ." See Shankman v. State, 184 N.J. 187, 208 (2005) (applying N.J.R.E. 403 analysis to whether to admit settlement-related evidence for a purpose permissible under N.J.R.E. 408). Defendant contends the jury could conclude (1) the offer was in fact made, which defense counsel denied, but

was hamstrung to refute at trial without exacerbating the prejudice; and (2) defendant in fact must have had that much money for him to offer it. There obviously are additional inferences a jury conceivably could draw: that defendant believed he caused $750,000 in harm, and plaintiff believed he caused greater harm than that.

The potential prejudice of plaintiff's comment was apparent to the trial judge who sustained the objection to it. However, the prejudice was not irremediable. It was a fleeting comment. Plaintiff did not even finish the statement that defendant made the offer. See Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009) ("Fleeting comments, even if improper, may not warrant a new trial, particularly when the verdict is fair.").

Furthermore, plaintiff's statement was not direct evidence of the amount of plaintiff's damages, or even defendant's assessment of plaintiff's damages. Thus, it is not equivalent to evidence of an admission. Cf. Boone, supra, 66 N.J. at 50 (holding evidence of a withdrawn guilty plea is highly prejudicial and therefore, inadmissible for any purpose at trial). Nor was it proof, even if true, defendant himself had $750,000 in hand to settle the case.[3]

---

[3] Evidence of insurance — which demonstrates the capacity to pay a judgment — is inadmissible "on the issue of . . . negligence or other wrongful conduct." N.J.R.E. 411. Yet, the mere passing

Rather, the testimony was prejudicial only if the jury made various inferences. See Richardson, supra, 481 U.S. at 206-08, 107 S. Ct. at 1706-08, 95 L. Ed. 2d at 184-86. Here, the trial court surmised that the jurors did not take particular notice of the comment because none of the jurors crossed out notes about the comment when instructed. Even if a juror made such an inference, the judge could explain those leaps were questionable because litigants are encouraged to settle cases, they may try to do so for various reasons, and their efforts do not prove they are liable for certain damages. Some jurors may have already understood that about settlement discussions. The others could be educated.

In sum, while it may be unrealistic to expect a jury to comply with an instruction to disregard evidence that directly proves the ultimate issue in the case, solely because the jury should not have heard it, the evidence here did not directly prove the quantum of damages, and the judge could — and did — provide reasons why jurors should ignore it.

Turning next to the timing and substance of the instruction, we recognize that the judge's initial effort, while swift, was misdirected. However, the jurors were released for the day soon thereafter. Upon their return the following morning, the judge

---

mention of insurance does not compel a mistrial. Runnacles v. Doddrell, 59 N.J. Super. 363, 368-69 (App. Div. 1960).

A-5520-14T3

promptly delivered an extensive instruction. As noted above, the judge did not simply direct the jurors to disregard plaintiff's statement, although he did so in clear and emphatic terms. He explained why they should do so, in substance, instructing them that settlement discussions should be disregarded for good reasons that were apt to be followed.

Third, the risk of imperfect compliance is not intolerable. Jury reliance on plaintiff's statement would not offend a constitutional right. Furthermore, it is far from clear that — even if some jurors considered plaintiff's statement in their deliberations — the testimony was "clearly capable of producing an unjust result . . . ." Winter, supra, 96 N.J. at 648 (quoting LaPorte, supra, 62 N.J. at 318-19). Defendant readily admitted that he sought to retain his medical license so he could compensate plaintiff in some measure. He also said he contemplated a possible cash settlement with plaintiff. Thus, the jury knew defendant was willing to settle with plaintiff, for some unknown amount, before hearing plaintiff's reference to a $750,000 offer.

We reject defendant's argument that the jury necessarily relied upon plaintiff's statement because its award was precisely twice the amount plaintiff mentioned. Defendant's argument rests on speculation. Plaintiff did not quantify the damages she sought. At most, the jury could surmise that plaintiff wanted more than

$750,000. Even absent the court's curative instruction, it is highly questionable that the jury credited plaintiff's statement. The plaintiff's case itself was grounded in the theory that she suffered from paranoia and delusions.

In sum, none of the three factors leads us to conclude that plaintiff's disclosure caused irremediable prejudice, or that the judge's curative instruction was so ineffectual that a mistrial or new trial was mandated. Even from our vantage point, confined to a cold record, and far removed from the human emotion of the courtroom, the substantial damages caused by defendant's conduct were manifest.

Defendant's liability was never in question. Nor, was the fact he inflicted some genuine harm upon his already brain-injured patient. The questions at the compensatory damage trial were: what kind of emotional, psychological, or neurological harm did defendant cause; how long did it, or would it last; and what amount of money would fairly compensate plaintiff for that harm. The jury evidently credited plaintiff's experts more than defendant's. We can only speculate how much plaintiff's own presence, throughout the trial and in testimony, contributed to the jury's verdict. However, the trial judge had a front row seat. He was best situated to draw conclusions about the impact of plaintiff's fleeting statement in the face of his curative instruction, and

32

the balance of evidence in the case. We shall not disturb his decision to deny defendant's requests for a mistrial and a new trial.[4]

4.

Defendant's remaining arguments challenging the compensatory damage award lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

III.

We next consider defendant's challenges to the punitive damage award. Plaintiff's counsel's stray reference to general deterrence in his opening statement was followed by a prompt objection, which the court sustained, and a specific instruction that the jury was to consider only deterrence of the wrongdoer, which was consistent with the current law. The judge then repeated the instruction at the end of the trial. We need not engage in a detailed analysis as we did regarding plaintiff's remark about settlement. We are satisfied the jury complied with the court's instruction, which remediated any prejudice counsel's stray comment may otherwise have caused.

---

[4] In light of the foregoing conclusion, we need not address plaintiff's argument that any prejudice defendant suffered from the reference to the alleged settlement offer originated with defense counsel's open-ended question, and therefore cannot serve as a vehicle for reversal.

33

Defendant also contends the punitive damage award was excessive, and the trial court failed to make explicit findings under the Punitive Damages Act (PDA), N.J.S.A. 2A:15-5.14(a), before entering judgment. As we agree with the latter point, we remand for appropriate findings, and do not reach the excessiveness point.

The PDA states, "Before entering judgment for an award of punitive damages, the trial judge shall ascertain that the award is reasonable in its amount and justified in the circumstances of the case, in light of the purpose to punish the defendant and to deter that defendant from repeating such conduct." Ibid. (emphasis added). In making its "justified in the circumstances" determination, the court must review the factors the jury considered under N.J.S.A. 2A:15-5.12(b). And, in deciding whether the award was "reasonable in its amount," the court must look at the same factors the jury considered under N.J.S.A. 2A:15-5.12(c) in setting the quantum of such damages. "If necessary to satisfy the requirements of this section, the judge may reduce the amount or eliminate the award of punitive damages." N.J.S.A. 2A:15-5.14(a).

The court's authority under N.J.S.A. 2A:15-5.14(a) is distinct from, and supplementary to, its power that pre-existed the PDA, to set aside an award because it is "so excessive as

34 <span>A-5520-14T3</span>

irresistibly to give rise to the inference of mistake, passion, prejudice or partiality."  Leimgruber v. Claridge Assoc., Ltd., 73 N.J. 450, 459 (1977).  The PDA was designed to expand the trial court's authority to control punitive damage awards.  See Pavlova v. Mint Mgmt. Corp., 375 N.J. Super. 397, 403 (App. Div.) ("The Legislature's purpose in enacting the Act was to establish more restrictive standards with regard to the awarding of punitive damages."), certif. denied, 184 N.J. 211 (2005); Dong v. Alape, 361 N.J. Super. 106, 118 (App. Div. 2003) ("The legislation evinces a pervasive legislative intent to curb, rather than expand, the availability of punitive damages.").

A trial court's exercise of authority under N.J.S.A. 2A:15-5.14(a) is reviewed for an abuse of discretion.  See Saffos v. Avaya Inc., 419 N.J. Super. 244, 264 (App. Div. 2011) (affirming a judge's decision to reduce, but not eliminate, a punitive damages award under N.J.S.A. 2A:15-5.14); Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 390 N.J. Super. 557, 565 (App. Div. 2007) (applying abuse-of-discretion standard of review in affirming a trial court's decision not to reduce an award under N.J.S.A. 2A:15-5.14), aff'd 194 N.J. 212 (2008).[5]  This deferential standard of

---

[5] In contending that we need not remand because we may review the award's reasonableness de novo, plaintiff misplaces reliance on Baker v. Nat'l State Bank, 353 N.J. Super. 145 (App. Div. 2002). Based on considerations of institutional competence, we held that a de novo standard of review applies to a trial court's

review of a trial judge's reduction or elimination of a punitive damage award is in keeping with the purpose of this provision to empower trial judges to review the record and determine if an award is reasonable in amount, and justified under the circumstances.

We remand so the judge, who had a feel of the case, may discharge that authority.

## IV.

In sum, we affirm the award of compensatory damages; remand for a determination whether the punitive damage award was reasonable and justified pursuant to the PDA. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

determination that a punitive damages award violated a defendant's substantive due process rights. Baker, supra, 353 N.J. Super. at 152-53; see also BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574-75, 116 S. Ct. 1589, 1598-99, 134 L. Ed. 2d 809, 826 (1996) (setting forth the factors for deciding substantive due process challenge). However, a due process challenge is distinct from a PDA analysis. See Baker v. Nat'l State Bank, 161 N.J. 220, 231 (1999) (distinguishing between review of a punitive damages award under PDA and under substantive due process standard of BMW v. Gore); see also Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S., 424, 433, 121 S. Ct. 1678, 1683-84, 149 L. Ed. 2d 674, 684-85 (2001) (noting that in absence of a constitutional issue, federal appellate court applies abuse-of-discretion standard when reviewing a trial court's scrutiny of jury award of punitive damages).