**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0073-23

MORTGAGE ACCESS
CORP., d/b/a WEICHERT
FINANCIAL SERVICES,

     Plaintiff-Appellant,

v.

RICHARD MEYER,

     Defendant-Respondent.

_____

Submitted December 4, 2024 – Decided February 14, 2025

Before Judges Currier and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-0705-23.

Laddey, Clark & Ryan, LLP, attorneys for appellant (Thomas N. Ryan and Thomas J. White, on the briefs).

Jonathan E. Hill, attorney for respondent.

PER CURIAM

Plaintiff Mortgage Access Corp., d/b/a Weichert Financial Services (Weichert), appeals from a July 11, 2023 judgment in favor of defendant Richard Meyer (Meyer) upholding an arbitration award of $1,224,485 in a Law Against Discrimination (LAD) action, N.J.S.A 10:5-1 to -40, as well as an award providing additional post-judgment interest and attorney's fees. After conducting a careful review of the trial court's decision and the arbitration award in light of the applicable principles of law, we affirm.

I.

In 2016, Weichert hired Meyer as a mortgage loan advisor in its Consumer Direct department. Meyer signed an arbitration agreement which required all disputes to be submitted to binding arbitration with the American Arbitration Association (AAA).

At the time of his hiring, Meyer was sixty-nine years old, the oldest individual employed by Weichert as a mortgage advisor. By 2020, Meyer was the only remaining Consumer Direct mortgage advisor as the other mortgage advisers had either left or moved to other positions within the company. Meyer's work primarily consisted of the refinancing of loans for Weichert's clients.

Meyer was one of the company's top performers in 2019 and continued to perform well in 2020, in part due to the favorable refinance market, resulting

from lower interest rates. In the first four months of 2020 Meyer earned $110,481, primarily in commission income.

The low interest rates continued during the COVID-19 pandemic, resulting in consumers' continued desire for refinancing of mortgages and Meyer was very busy. However, the pandemic adversely affected another of Weichert's departments, the Workforce Mobility Division, which experienced a 40% drop in its workload due to the lack of relocation business.

In response, company President Eric Declercq made the decision to discontinue Consumer Direct and reassign that work to the Workforce Mobility Division. Meyer's position was terminated on May 8, 2020. Meyer was seventy-two years old at the time.

During the arbitration hearing, Declercq testified that, in making this decision, he reasoned that Consumer Direct was a "rate-sensitive division" and since he believed "rates were going to be going up," he decided to "close that division strategically." Declercq further testified there were "no openings in [Weichert's retail division] . . . , and [the] . . . [Workforce] Mobility business was going . . . downward because of COVID[-19] . . . and [Meyer] was not qualified for" the Workforce Mobility work. Declercq conceded he did not

A-0073-23

review Meyer's past professional experience or performance to determine if he had the necessary qualifications for other positions.

Around the same time of Meyer's firing, Weichert hired a new employee who was approximately fifty-five years old to work in the Mobility Division. In October 2020, Weichert hired another employee, who was thirty-six years old, with no prior mortgage experience. She was transferred to Consumer Direct approximately six months later when the division re-opened.

Meyer began looking for work in June 2020. Within several weeks of his termination, Meyer found an online job advertisement for a position with Weichert and applied for it. Weichert declined to hire Meyer, informing him that he was not qualified for the position. Meyer obtained new employment in July 2020.

## II.

In December 2020, Meyer filed a complaint with the AAA, alleging Weichert violated the LAD in discriminating against him because of his age and not reassigning him to another position within the company. He sought compensatory and punitive damages. The parties then engaged in extensive discovery.

4

While the litigation was ongoing, Declercq expressed concerns in a podcast about the aging workforce in the real estate, mortgage, and title industries. He stated: "Many of us . . . are older dinosaurs in the industry and . . . it's hard for a lot of those folks to change." Declercq testified that his comment referred to challenges older employees faced with new technology.

During the podcast, Declercq also stated:

> I think everyone entered the business when I did so we're all in our mid 50s in this space and it's been a criticism of the population of mortgage advisors[,] . . . we have so many contemporary individuals who have entered that space. I have one young lady in particular. She started with us as an assistant. And she just had the eye of the tiger. And she tried to take her test three times and failed and finally she made it. She just wanted to get this done. I watched this young lady and we finally converted her to a mortgage advisor in the heart of this pandemic so she didn't know refinance or any of those other things. And she came out of the gate in her first two months in the middle of the pack of our sales organization just because . . . it is about your underlying talent and skill set, tenacity, eye of the tiger, you pick the word . . . we can teach anyone this business. It has effectively been the same forever. It doesn't matter what we're selling or doing . . . it's all about the individual.

Following the conclusion of discovery, Weichert moved for summary judgment. The arbitrator dismissed Meyer's failure to rehire claim but denied summary judgment on the age discrimination—wrongful termination claim.

A-0073-23

The arbitrator found Meyer "presented evidence sufficient for a reasonable finder of fact to conclude that the stated reasons . . . offered to justify the elimination of [Meyer]'s job did not actually motivate the employer's actions." As Meyer established a prima facie case of age discrimination, summary judgment was denied.

A hearing was conducted on July 13 and 14, 2022, during which the parties presented witnesses and documentary evidence. In addition to the facts stated above, Meyer alleged he suffered emotional distress following his termination from his job, stating he "became very depressed." He testified he was concerned about his finances and ability to afford his home, which he had recently purchased. In addition, he said he began arguing with his wife, had difficulty sleeping given his worries about finding a job, experienced stress, and began taking anti-depression medication.

Meyer asserted the arbitrator should rely on his income from the first four months of 2020 to calculate his economic damages. Weichert contended Meyer was not entitled to any economic damages because he did not present expert testimony to support his claim.

On October 6, 2022, the arbitrator issued a detailed well-reasoned Interim Award finding Weichert's "proffered business justifications for its decision to

eliminate the Consumer Direct Division and terminate [Meyer]'s employment [we]re not believable. Given the above as well as . . . Declercq's age-related statements, I find that [Weichert]'s proffered business justifications were pretext for age discrimination." The arbitrator supported her findings, in part, on job requisitions and hirings around or after the time of termination.

The arbitrator also found the age-related comments "made by . . . Declercq, the sole person responsible for the decision to eliminate Consumer Direct and terminate [Meyer]'s position, establish[ed] that he was motivated by discriminatory animus." In addition to Declercq's comments on the podcast, he stated in his deposition that the average age of the mortgage industry was "very high," that the industry was an "aging one" and they were always trying to find "new talent." The arbitrator found it was "clear" from Declercq's own statements that he was "very concerned about the aging mortgage advisor workforce and actively seeking out younger employees as replacements."

The arbitrator awarded Meyer $75,000 in emotional distress damages but did not award economic damages, stating "[c]alculating economic damages on th[is] record . . . would result in nothing more than pure speculation . . . without additional discovery . . . ."

A-0073-23

The arbitrator ordered Weichert to produce additional "identified discovery to [her] and exchange the same with [Meyer]." In response, Weichert argued that the request constituted post-hearing discovery and exceeded the arbitrator's authority and power under the AAA rules. Nevertheless, Weichert complied with the order. After reviewing the submissions, the arbitrator asked for additional information.

Thereafter, the arbitrator uploaded a document entitled "Economic Damages Award of Arbitrator" to the AAA's web portal that incorrectly stated Weichert had not complied with the discovery requests. The award contained detailed reasoning and calculations and awarded Meyer $183,473.80 in past economic damages.

Two days later, after considering all documentation and information provided by both parties, the arbitrator entered a "Second Interim Award" including a revised economic damages award totaling $243,849.86— $199,849.86 in back pay and $44,000 of lost base salary. The arbitrator provided detailed reasons supporting the back pay award, advising it was calculated only up to March 2022 when Meyer began working less hours due to health reasons.

A-0073-23

The arbitrator used the submitted data to calculate the amount of commissions Meyer would have earned on mortgage refinances had he remained employed with Weichert. The arbitrator's analysis also considered the number of leads and closed refinances attributed to Meyer compared to other company employees, finding that "[w]hen calculating the actual quarterly and monthly average total volume of closed refinances for each of the Mortgage Advisors/Destination Managers, it is clear that [Meyer]'s total volume was the second highest." Her analysis also accounted for the fact that the Mobility Division's work was down 40%, and as a result the employees were spending only 40% of their working time on refinance work. The arbitrator also deducted Meyer's mitigation earnings.

After hearing argument from the parties, the arbitrator permitted Meyer to present proofs regarding his punitive damages claim. The arbitrator found there was evidence that Weichert acted with "a wanton and willful disregard of [Meyer']s rights."

After a hearing on punitive damages, the arbitrator entered the Final Award on April 1, 2023. In considering the request for punitive damages, the arbitrator carefully considered the evidence and applicable case law. The arbitrator found Declercq's testimony "deceitful" regarding the decision to

eliminate the Consumer Direct Division and eliminate Meyer's position. We recite from her decision at length as necessary to understand the punitive damages award:

> Declercq's testimony that he made a strategic decision to close the Consumer Direct Division because of the resources needed to run that business and the state of the business is undercut by the testimony that within five months of [Meyer]'s termination, [a new employee], who is in her [thirties], had already been hired for the Consumer Direct Division, which was not yet reconstituted but already slated to be reconstituted. . . . Such close timing to when the Division was eliminated and slated to be reconstituted also certainly belies the claim that a strategic decision was made to eliminate the Division. Given that . . . Declercq is an experienced executive, the only reasonable logical conclusion to draw from close proximity of his decisions to eliminate the Division and, in turn, [Meyer's] position, and then reconstitute the Division is that the Division's elimination was simply an untruthful way to justify terminating [Meyer's] position so that he could be replaced by a far younger employee. Additionally, . . . Declercq testified that [Meyer] was not considered for another position within Weichert because, in part, there were no opportunities available for which Weichert was hiring. . . . In fact, when questioned further about how he reached the conclusion that no positions were available for [Meyer] in either Mobility or Retail, . . . Declercq testified, at one point, "we were not hiring in Mobility, period" and, at another point, "we had plenty of capacity in there, we didn't need the additional head count at that time[."] . . . Yet, [a new employee] was hired for the Mobility Division right around the time of [Meyer]'s termination. . . . Also, . . . Declercq testified that [Meyer] was not

10

A-0073-23

considered for the Retail Division because he lacked the qualifications to work in the sales office; yet, approximately five months later, [a new employee] was hired to work in Retail despite [having] similar experience to that of [Meyer]. . . . Also, . . . Declercq's assertions that [Meyer] was not qualified for any other positions and that he lacked the experience to be a mortgage advisor are contradicted by [Meyer]'s experience and . . . Declercq' s hearty assurances on the podcast that "we can teach anyone this business. It has effectively been the same forever. It doesn't matter what we're selling or doing . . . its all about the individual. . . . "

Also, while . . . Declercq testified that job elimination decisions are some of the most difficult decisions he has to make so he thinks "deeply" about those decisions, he did nothing to ascertain what experience [Meyer] had or what his professional background was. . . . Moreover, there was no believable reason why he even had to eliminate [Meyer]'s job given the facts of this case coupled with . . . Declercq's own testimony that he did not eliminate the Division as a cost-saving measure, [or] because he was told that he needed to eliminate jobs at W[eichert], as a result of C[OVID-19] or even because of the amount of work the Division was generating. . . . It is also rather curious that, in making a "strategic decision" to eliminate a position/division, . . . Declercq, when faced with [Meyer], who was incredibly busy and performing well albeit seventy years old, and the Mobility Division, which was comprised by considerably younger workers whose work had decreased by forty percent, . . . Declercq chose to eliminate [Meyer]/Consumer Direct. When these facts are juxtaposed against . . . Declercq's statements on the podcast, made after this arbitration asserting a claim of age discrimination was instituted, it is sufficient

11

evidence that [Weichert] was willfully indifferent to the discriminatory conduct at issue and that conduct was especially egregious.

Additionally, . . . [Meyer] was financially vulnerable having been terminated in the midst of a global pandemic when hiring had essentially stalled. Further, . . . the harm suffered by [Meyer] was not solely economic in nature. Indeed, his emotional distress, which resulted in his taking anti-depression medication first prescribed to him after the death of his son, was seemingly significant. . . . By referring to mortgage advisors in their fifties as dinosaurs, . . . Declercq sent [Meyer] the message, loudly and clearly, that [Meyer] was too old to even be considered a dinosaur. Also, by generalizing that it is "hard for a lot of those folks" (i.e., older mortgage advisors) "to change," . . . Declercq mocked and minimized the skills of [Meyer] and did it in a very in-your-face way—on a publicly broadcast podcast while already in the throes of this arbitration. His behavior was only made more boorish by the public platitudes bestowed upon [the new younger employee], who when hired had no mortgage experience and failed the exam multiple times, simply because she came out in the middle of the pack of the sales organization when [Meyer] was performing far better at the time of the termination of his employment. Indeed, the podcast was . . . Declercq's defiant, dismissive, and very public mocking of [Meyer] and his claims.

In determining the amount of the punitive damages award, thoughtful consideration was also given to both aggravating and mitigating factors. Aggravating factors included that, even as recently as January of 2023, [Weichert] refused to take responsibility for the discriminatory conduct in which it engaged and continued to insist that it did nothing

12

wrong despite the existence of clear evidence and a finding to the contrary. Another aggravating factor taken into consideration was that no discipline was taken against . . . Declercq because, certainly, if any such discipline had been taken, [Weichert] would have presented evidence of it during the punitive damages phase as a mitigating factor. Instead, . . . Declercq continues to be the President of W[eichert] and, thus, maintains responsibility for making decisions involving the hiring, firing, and promotions of applicants and employees. That said, careful consideration was given to [Weichert]'s downturn in business and concerns that a more significant punitive damages award, which would have been warranted in this case, had to be balanced against the possibility that it would trigger further lay-offs. Performing that balancing was particularly difficult to do given that W[eichert] is a fairly large, successful company with significant assets and available cash reserves and yet needs to be punished for its discriminatory termination of [Meyer] and deterred from engaging in such egregious conduct in the future. It is obvious that, . . . "[a] one-to-one ratio[]" would have been insufficient to deter future discriminatory conduct given [Weichert]'s "knowingly unlawful conduct." . . .

In light of the foregoing, awarding [Meyer] punitive damages in a ratio of punitives-to-compensatory damages of two to one is reasonable. As such, [Meyer] is entitled to an award of punitive damages of $680,617 when calculated after pre-judgment interest.

The arbitrator also awarded $199,761.25 in attorney's fees and $4,797.79 in costs. The total award was $1,224,485.

A-0073-23

Weichert moved before the Superior Court to vacate both the Second Interim Award and the Final Award, contending Meyer did not present evidence to support a reasonable calculation of economic damages and the arbitrator overstepped her authority in requesting additional discovery and in issuing the Second Interim and Final Awards. Following oral arguments, the court entered an order on July 10, 2023, confirming the Final Award and granting post-judgment interest and reasonable attorney's fees and costs.

In a written statement of reasons, the court reviewed the applicable provisions under N.J.S.A. 2A:23B-23(a) and found the arbitrator did not exceed her authority and operated within the applicable AAA rules, and did not demonstrate any evident basis. The court stated:

> Here, the AAA [r]ules plainly permitted the arbitrator to order further discovery on the issue of compensatory damages after issuing the First Interim Award. . . .The AAA [r]ules grant the arbitrator broad power to "set the rules for the conduct of the proceedings," and require the arbitrator to "exercise that authority to afford a full and equal opportunity to all parties to present any evidence that the arbitrator deems material and relevant to the resolution of the dispute." . . . Moreover, the AAA [r]ules instruct that the arbitrator "shall conduct the proceedings with a view toward expediting the resolution of the dispute, may direct the order of proof, [and] bifurcate proceedings." . . . Most notably, however, the AAA

14

[r]ules expressly provide that, "[i]f the parties agree or the arbitrator directs that documents or other evidence may be submitted to the arbitrator after the hearing[] . . . [a]ll parties shall be afforded an opportunity to examine such documents or other evidence and to lodge appropriate objections, if any.

Thus, included among the arbitrator's broad discretion are the abilities to, as the arbitrator did here, bifurcate the issues of establishing age discrimination under the [LAD] and the amount of back pay owed as compensatory damages, and order the submission of "documents or other evidence" after the first hearing and First Interim Award. . . . Therefore, the [c]ourt cannot find, pursuant to N.J.S.A. 2A:23B-23(a)(4), that the arbitrator exceeded her powers in reopening discovery as to the issue of [Meyer]'s back pay damages.

The court continued:

As to [Weichert]'s argument that the [a]rbitrator's actions in ordering [Weichert] to produce additional discovery relating to [Meyer]'s back pay damages demonstrated partiality, this measure was well within the arbitrator's powers under the AAA [r]ules, as discussed above, and otherwise legally proper under the LAD. . . . In the First Interim Award, the arbitrator's thorough, twenty-page decision analyzed the pertinent statute, caselaw, and each of [Weichert]'s proffered reasons for [Meyer]'s termination, concluding that those reasons were a pretext for unlawful age discrimination. . . . [Weichert] has not contested the arbitrator's conclusion that [its] conduct violated the LAD. . . . Having found that [Weichert]'s conduct violated the LAD, the arbitrator did not demonstrate partiality in finding that, "the difficulty in calculating

15

damages should [not] inure to the discriminating employer's benefit," and ordering further discovery.

IV.

On appeal, Weichert renews its assertions that the trial court erred in confirming the Final Award because the arbitrator harbored animus towards Weichert and exhibited "evident partiality" when making her decision, particularly regarding the punitive damages award. Weichert further contends the Final Award should be vacated because the arbitrator improperly calculated damages by relying on materials requested after the conclusion of the hearing, and Meyer did not prove his net income and probable loss of future earnings by a preponderance of the evidence.

The scope of "our review of an arbitration award is very limited." Bound Brook Bd. of Educ. v. Ciripompa, 228 N.J. 4, 11 (2017) (quoting Linden Bd. of Educ. v. Linden Educ. Ass'n ex rel. Mizichko, 202 N.J. 268, 276 (2010)). "To foster finality and 'secure arbitration's speedy and inexpensive nature,' reviewing courts must give arbitration awards 'considerable deference.'" Borough of Carteret v. Firefighters Mut. Benevolent Ass'n, Loc. 67, 247 N.J. 202, 211 (2021) (quoting Borough of E. Rutherford v. E. Rutherford PBA Loc. 275, 213 N.J. 190, 201 (2013)). "An arbitrator's award is not to be cast aside lightly. It is subject to being vacated only when it has been shown that a statutory basis

16

justifies that action." Ciripompa, 228 N.J. at 11 (quoting Kearny PBA Loc. 21 v. Town of Kearny, 81 N.J. 208, 221 (1979)).

Our review of the denial of a motion to vacate an arbitration award is de novo. Manger v. Manger, 417 N.J. Super. 370, 376 (App. Div. 2010). See also Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (holding no "special deference" is accorded the trial judge's "interpretation of the law and the legal consequences that flow from established facts").

V.

The Uniform Arbitration Act (the Act), N.J.S.A. 2A:23B-1 to -32, permits a court to vacate an arbitration award for the following limited reasons:

> (1) the award was procured by corruption, fraud, or other undue means;
>
> (2) the court finds evident partiality by an arbitrator; corruption by an arbitrator; or misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;
>
> (3) an arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy, or otherwise conducted the hearing contrary to section 15 of this act, so as to substantially prejudice the rights of a party to the arbitration proceeding;
>
> (4) an arbitrator exceeded the arbitrator's powers;

17

(5) there was no agreement to arbitrate, unless the person participated in the arbitration proceeding without raising the objection pursuant to subsection c. of section 15 of this act not later than the beginning of the arbitration hearing; or

(6) the arbitration was conducted without proper notice of the initiation of an arbitration as required in section 9 of this act so as to substantially prejudice the rights of a party to the arbitration proceeding.

[N.J.S.A. 2A:23B-23(a).]

Against this backdrop, we first address Weichert's contention that the arbitrator exceeded her authority under the AAA rules to request additional discovery after the hearing for the purpose of calculating damages. Weichert asserts that the arbitrator advocated for Meyer in considering discovery after the hearing, revealing bias and partiality.

AAA Rule 30 provides: "The arbitrator shall be the judge of the relevance and materiality of the evidence offered, and conformity to legal rules of evidence shall not be necessary." Am. Arb. Ass'n, Employment Arbitration Rules and Mediation Procedures r. 30 (rev. 2017). Further, in the event of a dispute, the parties "should notify the AAA of the dispute so that it may be presented to the arbitrator for a determination." AAA Rule 9." Am. Arb. Ass'n, r. 9.

Therefore, the AAA explicitly imbues an arbitrator with broad discretion in conducting discovery, including post-hearing discovery. See Minkowitz v.

18

Israeli, 433 N.J. Super. 111, 144 (App. Div. 2013). In addition, as the Legislature requires, in the interest of making the hearing "fair, expeditious, and cost effective," the arbitrator may permit "such discovery as the arbitrator decides is appropriate [under] the circumstances." N.J.S.A. 2A:23B-17(c). Moreover, the arbitrator can direct a party to comply with any discovery-related orders. N.J.S.A. 2A:23B-17(d). Therefore, the trial court did not err in finding the arbitrator acted properly when conducting post-hearing discovery and did not exceed her powers under the AAA rules or the Act.

We next address Weichert's assertion that the first uploaded "Economic Damages Award of Arbitrator" supports a finding of undue means or partiality sufficient to vacate the award under N.J.S.A. 2A:23B-23(a). We note preliminarily that Weichert did not seek to remove the arbitrator under the AAA rules when it suspected improper behavior.

AAA Rule 16(b), "Disqualification of Arbitrator," states "[u]pon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the arbitrator should be disqualified under the grounds set out above, and shall inform the parties of its decision, which decision shall be conclusive." Am. Arb. Ass'n, r. 16(b). Further, AAA Rule 36, "Waiver of Objection/lack of Compliance with These Rules," affirms

that "[a]ny party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with, and who fails to state objections thereto in writing or in a transcribed record, shall be deemed to have waived the right to object." Am. Arb. Ass'n, r. 36.

Notwithstanding Weichert's waiver of its right to attempt to disqualify the arbitrator, we analyze Weichert's assertions within the statutory framework. Our inquiry for "undue means" must reveal more than the occurrence of a mere mistake. Tretina Printing, Inc. v. Fitzpatrick & Assocs., Inc., 135 N.J. 349, 356-57 (1994). Rather, it

> requires that the arbitrator[] must have clearly intended to decide according to law, must have clearly mistaken the legal rule, and that mistake must appear on the face of the award. In addition, [for] the error[] to be fatal, [it] must result in a failure of intent or be so gross as to suggest fraud or misconduct.
>
> [Id. at 357 (quoting Perini Corp. v. Greate Bay Hotel & Casino, Inc., 129 N.J. 479, 494 (1992)).]

A finding of partiality requires a showing of "evident partiality" rather than simply an appearance of partiality. Barcon Assocs., Inc. v. Tri-Cnty. Asphalt Corp., 86 N.J. 179, 191 (1981).

In Barcon, our Supreme Court affirmed a trial court order that vacated an arbitration award rendered by a tri-partite panel because a panel member's

20

business dealings with a party to the arbitration constituted "evident partiality" under N.J.S.A. 2A:24-8(b), the predecessor to N.J.S.A. 2A:23B-23(a)(2). 86 N.J. at 182-83. The Court explained arbitrators are required to "avoid . . . actual partiality" and "the appearance of partiality." Id. at 189 (citation omitted). The Court found evident partiality was established because the panel member "was engaged in business dealings with and was owed substantial sums by" a party to the arbitration, and the Court concluded the "relationship create[d] too great an appearance of partiality to be permitted." Id. at 191 (emphasis omitted).

Here, the arbitrator was mutually selected by both parties. Weichert does not allege the arbitrator had any relationship or transaction with Meyer or his counsel. The evidence reveals that the arbitrator issued the Economic Damages Award (1) after the hearing on the merits; (2) after the parties complied with her first post-hearing discovery request and she had reviewed the submitted documents, and (3) under the mistaken belief that Weichert had not complied with her second discovery request. However, as Weichert concedes, once the arbitrator was informed of the error, she cured the mistake by advising the parties "to disregard" the award, reviewed the additional documents, and issued a Second Interim Award.

21

These actions did not constitute an "egregious mistake[] of law" as contemplated by N.J.S.A. 2A:23B-23(a)(1). Tretina, 135 N.J. at 356-57. Nor did the error display evident partiality. As the trial court found, all of the awards provided a "thorough . . . [analysis of] the pertinent statute, caselaw, and each of [Weichert]'s proffered reasons for [Meyer]'s termination." The awards also included extensive well-reasoned mathematical calculations of damages based on the submitted documents. Weichert has not demonstrated the "award was procured by . . . undue means" or the arbitrator acted with "evident partiality." N.J.S.A. 2A:23B-23(a)(1) to (2).

We turn to Weichert's contentions regarding the punitive damages award. Weichert asserts the arbitrator erroneously grounded her decision to award punitive damages primarily due to the podcast in which "De[c]lercq discussed [Weichert's] on-going desire to recruit new talent." Additionally, Weichert reiterates that the punitive damages award must be vacated due to the arbitrator's evident partiality and it being obtained through undue means.

Punitive damages awards in a LAD action are governed by both the LAD and the Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17, and should only be awarded in exceptional cases where the defendant exhibited "wanton or reckless conduct," Saffos v. Avaya Inc., 419 N.J. Super. 244, 262-63 (App. Div. 2011)

22

(quoting Catalane v. Gilian Instrument Corp., 271 N.J. Super. 476, 501 (App. Div. 1994)), which "[wa]s especially egregious." Rendine v. Pantzer, 141 N.J. 292, 313 (1995) (quoting Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 624 (1993)).

"The [first] key to the right to punitive damages is the wrongfulness of the intentional act." Saffos, 419 N.J. Super. at 263 (quoting Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49 (1984)). Actions by an employer "involving 'trickery and deceit'" satisfy that requirement and justify an award of punitive damages. Baker v. Nat'l State Bank, 353 N.J. Super. 145, 155 (App. Div. 2002) (quoting BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 576-77 (1996)). Such actions include a defendant's fabrication of legitimate reasons to terminate a plaintiff to justify a discrimination-based firing. Id. at 156.

Second, an award of punitive damages is justified where there is proof of "actual participation in or willful indifference to the wrongful conduct on the part of upper management," which includes both executive officers and "second tier" managers who have broad supervisory powers, including those to hire, fire and discipline employees. Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 113, 129 (1999) (citations omitted).

23

The aggrieved employee must provide proof of actions supporting a punitive damage award by clear and convincing evidence, meaning the evidence "should produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." State v. Hernandez, 334 N.J. Super. 264, 271 (App. Div. 2000) (quoting In re Purrazzella, 134 N.J. 228, 240 (1993)). In other words, "it is evidence that is 'so clear, direct and weighty and convincing as to enable . . . [the factfinder] to come to a clear conviction, without hesitancy, of the precise facts in issue.'" Ibid. (alteration in original) (quoting In re Seaman, 133 N.J. 67, 74 (1993)). Direct testimony can qualify as clear and convincing evidence. Ibid.

Further, a punitive damages award is required to be reasonable and "justified" by the wrongful conduct. Baker v. Nat'l State Bank, 161 N.J. 220, 229 (1999). As such, an award must be proportionate to the amount of harm suffered by and damages awarded to the aggrieved party. Pritchett v. State, 248 N.J. 85, 112 (2021).

In the Second Interim Award, the arbitrator found, and the trial judge agreed, that the "case was one of those exceptional cases where punitive damages [we]re warranted," because the facts, including the statements made by

Declercq during the podcast, "unequivocally demonstrated bias against older workers as well as a wanton and willful disregard of [Meyer]'s rights."

The trial court found the punitive damages award was supported by the arbitrator's thorough factual and legal analysis. The arbitrator considered the facts under the factors outlined in Model Jury Charge (Civil), 8.61, "Punitive Damages—Law Against Discrimination (LAD) Claims" (rev. Nov. 2022), finding, among other things, that: the intent behind Weichert's decision to terminate Meyer's employment was evidently discriminatory due to Weichert's statements showing bias against older workers; Weichert's actions caused Meyer serious harm; Weichert was aware of that harm; despite this awareness Weichert refused to re-assign Meyer to another position; and Weichert's wrongful conduct continued through the arbitration proceedings in specific comments demonstrating bias against older workers.

Further, after the arbitrator discussed the relevant case law, she considered the aggravating and mitigating factors. She found Weichert's refusal to take responsibility for the discriminatory conduct in which it engaged and the lack of any disciplinary action taken against Declercq were aggravating factors.

As stated, Weichert bears a heavy burden in seeking to vacate the arbitration award as there is a "strong judicial presumption in favor of [its]

A-0073-23

validity." <u>Del Piano v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, 372 N.J. Super. 503, 510 (App. Div. 2004). After our careful review, for the reasons articulated above, we conclude Weichert has not met its burden and has not demonstrated any reason to vacate the award under N.J.S.A. 2A:23B-23(a).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0073-23